**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| **v.** | : | **NO.  24-3-1, 2, 3, 4, 5** |
| | : | |
| **MIKAL MCCRACKEN, AMIN MUSE,** | : | |
| **ALEEM ABDUL-HAKIM, DEAN** | : | |
| **FOSQUE, KAVON COLEMAN** | : | |

**<u>MEMORANDUM</u>**

**MURPHY, J.**                                             **October 30, 2025**

In 2021 and 2022, a long string of violent carjackings gripped Philadelphia.  Tragically, the carjackings culminated in two murders.  Investigators had no suspects, but they had a theory.  Many of the attacks were in a particular area of the city, and many targeted newer-model Toyota SUVs.  The offenders attacked in a small group, covered their faces, brandished handguns, and often struck or shot their victims.  Some attacks were linked by ballistic evidence or descriptions of the attackers' vehicle.  Investigators believed that this type of coordinated carjacking scheme would require the offenders to carry mobile telephones to communicate with each other.  But how can you find a cell phone that was present at the scene of a string of crimes?

The investigators decided to go to the cell phone companies with what are known as tower dump and geofence warrants.  In essence, the warrants set out a list of the times and places where the carjackings or closely related events occurred, and for each, ask for a list of devices connected to the cell network within a 20–30-minute window and 0.2–0.5-mile radius.  The data included thousands of devices identified by various code numbers, but investigators found two that were present at multiple carjackings.  Further warrants based on that result led directly to the arrest and indictment of the defendants in this case.

The lead defendant — Mikal McCracken — now challenges the legality of these searches

under the Fourth Amendment and moves to suppress the evidence uncovered from them.

Several other defendants join.  Although this case has its unique facts (which we critically rely

on), we are hardly writing on a blank slate.  Courts around the country have been struggling with

how to apply the Fourth Amendment to the incalculable trove of geolocation and other data that

third-party information-technology vendors possess — and that government investigators may

choose to seek.  Here, although the government argues that Mr. McCracken had no privacy

interest in data indicating that the subject cell phone was in a particular place at a particular time,

the government does not have to win that argument because it obtained warrants backed with

detailed affidavits for every step of the process.  Mr. McCracken attacks those warrants.  We

held an evidentiary suppression hearing and received testimony of Mr. McCracken's expert and

the government investigators.  Because we hold the search warrants are constitutional, and even

if they were not, the good faith exception precludes suppression, we deny Mr. McCracken's

motion.

## I.    FINDINGS OF FACT

We make the following findings of fact.  *See* Fed. R. Crim. P. 12(d) ("When factual

issues are involved in deciding a motion, the court must state its essential findings on the

record.").

In early 2022, law enforcement faced a problem: Perpetrators were carrying out a string

of violent car jackings across Philadelphia since December of 2021, but the government was

unable to determine their identities.  DI 211-1 at 12 (Tower Dump Warrant).[1]  This led the

---

[1] We adopt the pagination supplied by the CM/ECF docketing system.  Additionally, the first time we cite a document we refer to it by a shorthand name in parentheses for clarity.

Federal Bureau of Investigation (FBI) to apply for two types of search warrants directed to mobile telephone companies based on the theory that they were likely to identify one or more mobile devices that were in use at the times and places of multiple carjackings or related events.

The first of these warrants is known as a tower dump. A tower dump collects data showing which devices connected to specific cell towers, in a specific area, at a specific time. The data provided by T-Mobile[2] in response to this warrant consists of mostly phone calls and occasional text messages that are made or received by phones that connected to the relevant towers. DI 238 at 141 (Hearing Transcript). Under the warrant, the government does not receive the content of the individual calls or messages, but it rather is provided a record showing the phone number of each device that contacted the tower along with its International Mobile Equipment Number (IMEI) and International Mobile Subscriber Identity Number (IMSI)[3], and the phone number of the device being communicated with. *Id;* DI 211 at 16 (Government's Opposition Brief). If the government seeks additional information about those records, such as account owner information, then it must pursue additional legal process. DI 238 at 141.

Here, the government applied for a tower dump warrant that ordered T-Mobile to produce records for cell towers that serviced 20 locations associated with 12 carjackings, each within a time window of 20-30 minutes.[4] DI 211-1 at 34-35. Magistrate Judge Wells approved

---

[2] The Government also applied for similar warrants for AT&T and Verizon. DI 211-1 at 35. But since Mr. McCracken has moved to suppress only the records from T-Mobile, we focus exclusively on T-Mobile's data production.

[3] The IMEI and IMSI numbers are unique (usually 15-digit) identifiers for phones.

[4] The time windows were calculated by the FBI Cellular Analysis Survey Team (CAST) to capture the minutes before the crime when the suspects were canvassing the area as well as the

the warrant.  211-1 at 1 (ECF).  But the government never investigated the tower dump returns because by the time that T-Mobile handed over the records, the FBI was already moving on leads from the other warrant — the geofence warrant — as explained below.  DI 238 at 142.

A geofence warrant — also known as a timing advance area search warrant — collects data from cell-phone companies that identify devices estimated to be in a specific area at a specific time.  *Id.* at 133.  Determining the approximate location of a cell phone is more complicated than it might seem, but essentially, each time a device contacts a cell tower (to make a phone call, for instance) a signal travels from the cell tower to the device and back.  The amount of time it takes for this signal to travel yields an approximate distance between the cell phone and the cell tower in a general direction.  *Id.* at 129.  Importantly, this cellular geofence approach is significantly less precise than a Google geofence search, which collects Global Positioning Satellite (GPS) data.  *Id.* at 139-140; DI 211 at 18-19.

In response to the geofence search warrant, T-Mobile returned for each device the estimated latitude/longitude coordinates of the device, its make and model, the IMSI and IMEI numbers, the cell tower used, and the approximate distance the user was from the tower.  DI 238 at 135; DI 211 at 17; DI 204-6 at 2-3 (ECF) (Exhibit E Subfolder Ex. 4).  As with the tower dump warrant, if the government wants more information about these records, it must pursue additional legal process.  DI 238 at 135-36.

Here, the government applied for a geofence warrant that ordered T-Mobile to produce

---

immediate aftermath when the suspects were fleeing the scene.  DI 238 at 184-85.

records for devices within 0.2, 0.3, or 0.5 miles (depending on the location)[5] of the same 20

locations and time ranges of the tower dump warrant. DI 211-2 at 29 (ECF) (Geofence Warrant).

The exact language of the "Property to Be Searched" was: "This warrant applies to a Timing

Advance 'True Call' area search, also known as geofencing, for all records and unique

device/user identifiers pertaining to Timing Advance location information during the following

listed dates, times and geographical boundaries (distance from the GPS points):" followed by a

table of the 20 locations. *Id.* Each entry of the table corresponds to one of the locations,

narrowed by date, time period (20-30 minutes), latitude/longitude coordinates (corresponding to

the addresses of the crimes or related events), and "distance from location" of 0.2, 0.3, or 0.5

miles. *Id.* Fairly understood, "distance from location" means a radius. Judge Wells approved

the warrant (DI 211-2 at 1 (ECF)), and T-Mobile produced the records shortly thereafter.

　　　In the context of this motion to suppress, the prosecution and defense dispute whether T-

Mobile's production was faithful to the warrant. At the hearing, the government's main

witness — FBI agent and CAST member Jeffrey Guagliardo — testified that T-Mobile could not

search for all their users within a radius of the requested distance from the target locations (in

this case 0.2, 0.3, or 0.5 miles). DI 238 at 143-44. Instead, T-Mobile drew a square. So, for

example, if the warrant called for 0.3 miles from 6400 Greenway Avenue (the first location in

the warrant), T-Mobile measured the distance 0.3 miles north, south, east and west from this site

and created a square perimeter. *Id.* at 144. T-Mobile then used a proprietary algorithm to

---

[5] The distances of 0.2, 0.3, and 0.5 miles were determined by the CAST team. The agents analyzed where the cell towers were relative to each crime location, and chose a distance that would capture a representative sample of the devices in the area without being overinclusive. DI 238 at 183-84.

determine which users had a latitude/longitude that placed them within the square at the times requested in the warrant.  *Id.* at 145-46.  Importantly, Agent Guagliardo clarified that the government did not rely on the T-Mobile-generated latitude/longitude coordinates in assessing whether the user was near the crime.  Rather, the government used the underlying timing advance information (which is also returned by T-Mobile and shows the approximate distance the device is from the cell tower) to map the user's approximate location.  *Id.* at 149; *see also* DI 204-6 at 2-3 (ECF).

Nonetheless, Agent Guagliardo admitted on cross examination that the geofence warrant itself called for a radius search around the target location, rather than a square perimeter as T-Mobile drew.[6]  DI 238 at 202-03. Thus, T-Mobile did not literally comply with the search warrant and instead overproduced because there were some records that fell within the corners of the square but outside the circle.  *Id.* at 205.  Below is a simple illustration, with the green circle representing the radius search called for by the warrant, the square representing the area T-Mobile searched, and the blue shading representing the areas of overproduction.

---

[6] The warrant does not actually say the word "radius," but rather uses the phrase "distance from location."  DI 211-2 at 29 (ECF).  But Agent Guagliardo acknowledged that language calling for a search of 0.3 miles (for instance) from a specific spot is akin to a circle of a 0.3-mile radius around that specific spot, with the target location being the center of the circle. DI 238 at 202.  Still, the absence of the word "radius" in the warrant leaves some gray area here, and even Mr. McCraken's defense team seemed unsure by what the warrant called for, as they first used a square geofence perimeter in their expert report and later used a circle.  *Compare* DI 159-2 (Cornerstone's First Report), *with* DI 204-2 (Cornerstone's Amended Report).

The extent of T-Mobile's overproduction is not immediately clear or easily ascertained. The defense's expert witness Ben McCollum — a forensic examiner at Cornerstone Discovery[7] — testified that the records T-Mobile provided to the government for the first five locations contained significant numbers of users who were outside the geofence perimeter (what he defined as "errors").[8]  DI 238 at 47-48; DI 204-2 at 15-16 (ECF).  Mr. McCollum analyzed the records chronologically for each location until he reached the 100th defined error.  DI 204-2 at 15-16 (ECF).  He then extrapolated to deduce the estimated percent error in the entire data set, assuming that errors would continue at the same rate.  *Id.*  In this way, Mr. McCollum determined that the estimated percent error for each of the first five locations respectively was

---

[7] Cornerstone is a digital forensic investigative company that was retained by the defense to review the records produced by the geofence and tower dump warrants.  DI 204-2 at 4.

[8] Mr. McCollum limited his analysis to the first five locations because he is working under the Criminal Justice Act and is allotted a set number of hours.  DI 238 at 46-47.

9.73%, 3.22%, 8.03%, 3.59%, and 3.88%.[9]  DI 238 at 58-60; DI 204-2 at 16 (ECF).

We find Mr. McCollum's testimony helpful, but his conclusions were undermined by Agent Guagliardo.[10]  Agent Guagliardo credibly testified that it is challenging to determine which records returned by T-Mobile were truly outside of the geofence perimeter.  One reason for this is the presence of Distributed Antenna System (DAS) sites.  DAS sites function like extension cords: a cell provider takes individual antennas and spreads them out to areas where it is looking to either fill a gap in coverage or provide additional capacity.  Those sites are then connected through a fiber optic cable back to the actual base station.   DI 238 at 128-29.  The problem with DAS sites for a geofence search is that the length of the cable and other

---

[9] Cornerstone appears to allege that T-Mobile's noncompliance with the warrant goes beyond merely using a square rather than a circle for the geofence perimeter.  Cornerstone argues that T-Mobile's proprietary algorithm to locate devices is "inherently unreliable" and can lead to significant false positives and misinterpretations of user locations.  DI 204-2 at 12 (ECF).  But we have not seen evidence sufficient to overcome Agent Guagliardo's confidence in T-Mobile's proprietary algorithm and his credible testimony that its returns have generated successful leads in this case and others.  DI 238 at 142-43.

[10] On a motion to suppress, the district court sits as fact finder and makes any necessary credibility judgments.  *See United States v. Harris*, 507 F.2d 197, 198 (3d Cir. 1975).  Factors to consider in determining credibility include:

> (1) The opportunity and ability of the witness to see or hear or know the things about which the witness testifies; (2) The quality of the witness knowledge, understanding, and memory; (3) The witness appearance, behavior, and manner while testifying; (4) Whether the witness has an interest in the outcome of the case or any motive, bias, or prejudice; (5) Any relation the witness may have with a party in the case and any effect that the verdict may have on the witness; (6) Whether the witness said or wrote anything before trial that is different from the witness testimony in court; (7) Whether the witness testimony is consistent or inconsistent with other [believable evidence]; and (8) Any other factors that bear on whether the witness should be believed.

Third Circuit Model Criminal Jury Instructions, Instruction 1.10-Credibility of Witnesses; *see United States v. Thompson*, No. 15-cr-222, 2015 WL 5159180, at *4 (E.D. Pa. Sept. 2, 2015).

infrastructure delay the time for a person's cell signal to travel from the base station to the device and back. This has a tendency to make it look as though the person is miles from a cell tower, when in reality he is much closer. DI 130-31. Thus, when a DAS is involved, a device could falsely appear like it is outside the geofence perimeter. *Id.* Mr. McCollum admitted on cross examination that Cornerstone did not fully account for DAS sites in its methodology to determine errors. DI 238 at 93-96. Agent Guagliardo also emphasized that Cornerstone did not factor in the theory of multipath, which explains that a signal does not necessarily travel in a straight line from a cell tower to the device and back, and thus the device could appear slightly outside the geofence perimeter when it is not actually located there. *Id.* at 123, 176.

Analyzing cell records is complicated, and we have been given only a glimpse into the process. But it is clear to us that (1) T-Mobile overproduced a modest number of records; and (2) the overproduction is significantly smaller than the defense argued. As to the government's contemporaneous awareness of this overproduction, Agent Guagliardo acknowledged that he knew T-Mobile would comply with the warrant by drawing a square rather than a circle.[11] *Id.* at 205. However, Agent Matthew Yaeger — the affiant on the geofence warrant — testified that he was unaware how specifically T-Mobile retrieved its data. *Id.* at 217-18. We have been given no reason to doubt Agent Yaeger's statement.

Setting aside T-Mobile's overproduction for the moment, we turn to the remaining

---

[11] Agent Guagliardo bristled somewhat at the suggestion that there were *any* "errors" in T-Mobile's return, apparently because although he knew what T-Mobile would do, he did not think the warrant was calling for anything different than what he knew T-Mobile would do. We adopt both conclusions: the warrant on its face called for a search within a circular perimeter, not a square one; yet Agent Guagliardo thought the warrant was entirely consistent with T-Mobile's approach.

pertinent facts. After the FBI examined the records produced from the geofence warrant, it identified two devices of interest: An IMSI number 310260027715498, which was located within 13 of the 20 geofenced areas at the relevant times, and an IMSI number 310260298864475, which was located within 9 of the 20 geofenced areas at the relevant times. DI 211-3 at 38-39 (ECF) (McCracken Historical Cell Site Warrant). From there, the FBI obtained two additional warrants to retrieve historical cell site information from these devices.[12] DI 238 at 136-37; DI 211-3; DI 211-4. The government determined that the two devices belonged to Mikal McCracken and Amin Muse, and the CAST team utilized the historical cell site information to plot Mr. McCracken and Mr. Muse's locations over the course of the conspiracy later charged. DI 238 at 138; DI 211-5 (CAST Report).

## II. PROCEDURAL HISTORY

On July 24, 2024, a grand jury returned a superseding indictment against Mikal McCracken, Amin Muse, Aleem Abdul-Hakim, Dean Fosque, Kavon Coleman, Amadou Moussa, and Davon Squire, arising from a large-scale carjacking conspiracy. DI 68 (Superseding Indictment). The crimes charged include dozens of completed gunpoint carjackings, attempted but unsuccessful car jackings, murder of a carjacking victim, murder of a potential witness, identify theft, and a scheme to export carjacked and stolen cars for sale in Africa. DI 211 at 4.

Mr. McCracken filed a motion to suppress evidence on April 14, 2025, which he

---

[12] Historical cell site warrants target specific devices and provide the government with comprehensive location records (among other things) for the users of these devices for a fixed time period. In this case, the government requested records from September 1, 2021 to February 22, 2022. DI 238 at 137; DI 211-3 at 55; DI 211-4 at 55 (Muse Historical Cell Site Warrant).

amended on September 17, 2025.  DI 159 (Motion to Suppress); DI 204 (Amended Motion to

Suppress).  Mr. McCracken specifically seeks to suppress the evidence uncovered in response to

three warrants: (1) the evidence T-Mobile supplied in response to the February 15, 2022

geofence warrant that placed what is allegedly Mr. McCracken's phone's IMSI number in 13 of

the 20 geofence locations; (2) the evidence T-Mobile supplied in response to the February 15,

2022 tower dump warrant; and (3) the evidence T-Mobile supplied in response to the February

22, 2022 warrant, which shows what is allegedly Mr. McCracken's historical cell site

information.  DI 204 at 9-13.  Mr. McCracken argues that the geofence and tower dump warrants

are constitutionally infirm under the Fourth Amendment and that the historical cell site warrant

should be suppressed because it was derived from these earlier warrants, thus making it the fruit

of the poisonous tree.  *Id.*

Mr. Muse, Mr. Fosque, Mr. Abdul-Hakim and Mr. Coleman all moved to join in Mr.

McCracken's motion.  *See* DI 193 (Muse's Motion); DI 195 (Fosque's Motion); DI 198 (Abdul-

Hakim's Motion); DI 203 (Coleman's Motion).  The Government opposes, arguing that the

geofence, tower dump, and historical cell site warrants were all constitutionally sound.  DI 211.

The government also contests Mr. Fosque, Mr. Abdul-Hakim, and Mr. Coleman's standing to

join Mr. McCracken's motion.[13]  *Id.*  We held an evidentiary hearing on the motion to suppress

on October 6, 2025, which was the basis for our fact findings set out above.

## III.    STANDARD OF REVIEW

"As a general rule, the burden of proof is on the defendant who seeks to suppress

---

[13] Because we ultimately deny Mr. McCracken's motion to suppress, the standing issue
pertinent to the other defendants is moot.

evidence." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir.1995). "However, once the defendant has established a basis for his motion, *i.e.*, the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable." *Id.* The Government's burden is a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 178 n.14 (1974); *United States v. Jones,* 2024 WL 3540982, at *2 (E.D. Pa. July 24, 2024).

## IV.    CONCLUSIONS OF LAW

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Supreme Court defined the modern limits of a constitutionally protected search in *Katz* v. *United States*, 389 U.S. 347 (1967), writing that "the Fourth Amendment protects people, not places" and that when an individual "seeks to preserve [something] as private" and his expectation of privacy is "one that society is prepared to recognize as reasonable," government intrusion into that sphere generally qualifies as a search and requires a warrant. *Id.* at 351, 359; *Carpenter v. United States*, 585 U.S. 296, 304 (2018). When the government fails to obtain a warrant, the defense can move to suppress the fruits of this search from being presented at trial. *Herring v. United States,* 555 U.S. 135, 139 (2009).

Still, "there is no constitutional right to have the evidentiary fruits of an illegal search or seizure suppressed at trial." *United States v. Katzin*, 769 F.3d 163, 170 (3d Cir. 2014). Rather, "[a]pplication of the exclusionary rule is instead limited to those 'unusual cases' in which it may achieve its objective: to appreciably deter governmental violations of the Fourth Amendment." *Id.* (quoting *United States v. Leon*, 468 U.S. 897, 918 (1984)). Thus, when the particular facts of

a case indicate that law enforcement officers "acted with an objectively reasonable good-faith belief that their conduct was lawful . . . there is no illicit conduct to deter" and "exclusion cannot pay its way." *Katzin*, 769 F.3d at 171 (citation modified).

Therefore, for Mr. McCracken to succeed on his motion to suppress he must show: (1) the tower dump and geofence intrusions were constitutionally protected searches; (2) the government's warrants were defective; and (3) the warrants were not executed in good faith. We ultimately defer ruling on the first question, but conclude that the warrants were constitutional, and that even if they were not, good faith precludes suppression.

## A. Whether the tower dump and geofence were constitutionally protected searches

As discussed above, the Fourth Amendment protects certain expectations of privacy where an individual "seeks to preserve something as private" that "society is prepared to recognize as reasonable." *Smith v. Maryland,* 442 U.S. 735, 740 (1979) (citation modified). Neither the Supreme Court nor the Third Circuit has determined whether a tower dump or geofence is a constitutionally protected search. The closest precedential benchmark is *Carpenter,* 585 U.S. at 310, where the Supreme Court held that the government's acquisition of seven days of historical cell site location information (CSLI) constituted a search requiring a warrant. Central to the Court's reasoning was that mapping a cell phone's location over a period of days "provides an intimate window into a person's life, revealing not only his particular movements, but through them his familial, political, professional, religious, and sexual associations." *Id.* at 311 (citation modified). However, the Court emphasized that its decision was a "narrow one" and that they were not expressing a view on "real-time CSLI or tower dumps." *Id.* at 316; *see also United States v. Adkinson*, 916 F.3d 605, 611 (7th Cir. 2019)

13

("[Carpenter] did not invalidate warrantless tower dumps.").

In the years since *Carpenter,* some district courts have concluded that because tower dumps provide a more limited window into people's lives as compared to historical cell site information, they are not constitutionally protected searches. *See, e.g., United States v. Walker,* No. 2:18-CR-37, 2020 WL 4065980, at *8 (E.D.N.C. Jul. 20, 2020) ("In light of the significant differences between a Tower Dump CSLI and long term CSLI targeted at the whole of an individual's movements, as highlighted by the court's decision in *Carpenter*, the court finds no basis for attaching a Fourth Amendment interest to Tower Dump CSLI."); *United States v. Pricop*, 775 F. Supp. 3d 1036, 1039 (D. Ariz. 2025) ("Because the Tower Dumps here did not allow ATF access to the whole of anyone's movement, or anything close, the Court will not extend *Carpenter* to require probable cause for Tower Dumps.") (citation modified).

But other district courts have recognized privacy concerns implicated by tower dumps and have required the government to obtain a warrant. *See, e.g., United States v. Medina*, 712 F. Supp. 3d 226, 246 (D.R.I. 2024), *rev'd on other grounds*, 125 F. 4th 310 (1st Cir. 2025) ("The basic purpose of the Fourth Amendment is to safeguard the privacy and security of individuals against arbitrary invasions by government officials. People quite reasonably assume that the Government should not be able to use your cell phone to spy on you. Here, the Government engaged in mass surveillance of an entire population for over four hours. This was a violation of the Fourth Amendment.") (citation modified); *In re Four Applications for Search Warrants Seeking Info. Associated with Particular Cellular Towers*, No. 3:25-CR-38-CWR-ASH, 2025 WL 603000, at *5 (S.D. Miss. Feb. 21, 2025) ("Just as an individual has a legitimate expectation of privacy in the record of his physical movements as captured through CSLI, he has a

14

reasonable expectation of privacy as to the record of his location at particular moments in time that a tower dump would reveal.") (citation modified).

Courts similarly divide over whether a geofence is a constitutionally protected search. For example, in *United States v. Chatrie*, 107 F.4th 319, 330-332 (4th Cir. 2024), a Fourth Circuit panel found that the government's examination of two hours of Mr. Chatrie's location data was "far less revealing" than the data obtained in *Carpenter* and thus did not constitute a Fourth Amendment search.[14]  However, in *United States v. Smith*, 110 F.4th 817, 832-33 (5th Cir. 2024), the Fifth Circuit sharply disagreed, emphasizing that "perhaps the most alarming aspect of geofences is the potential for permeating police surveillance" and that "while it is true that geofences tend to be limited temporally, the potential intrusiveness of even a snapshot of precise location data should not be understated." (citation modified).

Here, the government successfully found records of Mr. McCracken's phone in 13 of the 20 geofence locations listed in the warrants.[15]  DI 213 at 2 (McCracken's Reply).  This totaled 4.5 hours of location history over a period of seven weeks.  *Id.*  Such an intrusion into Mr. McCracken's life was not insignificant, but it was also far less invasive than the search performed in *Carpenter* because it was performed in isolated windows of time (20-30 minutes) around specific locations where carjackings had occurred.  It is also significant that the government could not obtain Mr. McCracken's name without another warrant.  DI 238 at 135-

---

[14] When the case was reheard *en banc*, the full court affirmed the district's court's denial of the motion to suppress but could not come to a broader agreement.  *See United States v. Chatrie*, 136 F.4th 100, 100 (4th Cir. 2025).

[15] The parties have not made explicit the extent to which Mr. McCracken's location information appeared in the tower dump search, but presumably it was similar.

36.  Still, we hesitate to say that no reasonable person would expect their location data kept private, and we have little appreciation (beyond the powers of imagination) of the potential consequences of allowing the government unfettered access to this technology without the guardrails of a warrant.  *See Carpenter*, 585 U.S. at 385 ("[A] central aim of the Framers was to place obstacles in the way of a too permeating police surveillance.") (citation modified).

For those reasons, we think it would be unwise to agree with the government that the warrants in this case were an unnecessary administrative flourish — or a mere tactical fallback for potential litigation.  But there is no need for an extensive constitutional analysis because all that matters here are the facts on the ground for the case in front of us, which is barreling toward trial.  And as a matter of fact, the government prepared and secured detailed warrants covering all the relevant activities here.  So, we will instead focus on the sufficiency of these documents, namely whether they contained adequate probable cause and particularity.  *See United States v. Sherod,* No. CR SAG-24-0120, 2025 WL 1736279, at *3 (D. Md. June 23, 2025) ("[B]ecause the investigators here sought and obtained search warrants for all of the tower dump records, this Court need not address this [reasonable expectation of privacy] issue, which has been hotly contested in various courts since the Supreme Court left the question open in Carpenter."); *Matter of Search Warrant Application for Geofence Location Data Stored at Google Concerning an Arson Investigation*, 497 F. Supp. 3d 345, 360 (N.D. Ill. 2020) ("[T]he Court does not need to reach this question [about whether this was an official search] because the government has chosen to obtain a warrant to obtain the geofence data based on a showing of probable cause.").

## B.  Sufficiency of the tower dump and geofence warrants

### i. Probable Cause

"To obtain a search warrant, the government must present probable cause that evidence

of criminal activity will be found in the place to be searched." *United States v. Alexander*, 54 F.4th 162, 171 (3d Cir. 2022). "[P]robable cause is a fluid concept — turning on the assessment of probabilities in particular factual contexts — not readily, or even usefully, reduced to a neat set of legal rules.'" *Illinois v. Gates*, 462 U.S. 213, 232 (1983); *Alexander*, 54 F.4th at 171. To establish probable cause, a magistrate judge must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238.

We afford "great deference" to a magistrate's determination of probable cause. *Id*. at 236; *United States v. Miknevich*, 638 F.3d 178, 181 (3d Cir. 2011). A district court must uphold the warrant so long as the magistrate had a "substantial basis" for concluding that probable cause existed. *Gates*, 462 U.S. at 238. To make this determination, we consider only "the facts that were before the magistrate, *i.e.*, the affidavit." *United States v. Jones*, 994 F.2d 1051, 1055 (3d Cir. 1993). The affidavit "must be read in its entirety and in a common sense and nontechnical manner." *United States v. Williams*, 124 F.3d 411, 420 (3d Cir. 1997); see *United States v. Conley*, 4 F.3d 1200, 1206 (3d Cir. 1993) ("Moreover, statements in an affidavit may not be read in isolation — the affidavit must be read as a whole.").

Considering the totality of the tower dump and geofence affidavits, they provided a substantial basis for Judge Wells to have found probable cause. The affidavits detail twelve carjackings and attempted carjackings that occurred in Philadelphia from December 2021 to February 2022. The affidavits are specific to the time and place where each of these crimes occurred and rely on victim statements, video surveillance, and independent physical evidence to

inform these conclusions.  DI 211-1 at 12-27 (ECF); DI 211-2 at 6-21 (ECF).   The affidavits also lay out why the government believed the same group of offenders was behind each of these carjackings: multiple offenders were involved in each incident; the offenders were always armed with handguns; the offenders targeted newer-model Toyota SUVs; the attacks were in the far southwest portion of Philadelphia; they shot multiple victims; and two of these shootings were linked by ballistic evidence.   DI 211-1 at 27 (ECF); DI 211-2 at 21 (ECF).

Further, the affidavits explain how call records work and how it is possible to determine what device was in contact with relevant cell towers at the time that crimes were being committed or relevant events occurred.  DI 211-1 at 30-31 (ECF); DI 211-2 at 22-25 (ECF).  Finally, the affidavits pinpoint 20 locations to search that share a nexus to the carjackings, either in being where the carjackings occurred or where related events transpired such as the moving of a victim's car. DI 211-1 at 32 (ECF); DI 211-2 at 25-26 (ECF).

Mr. McCracken does not contest these facts but rather argues that the warrants are "facially deficient" because they do not establish that the perpetrators were observed in possession of cell phones.  DI 204 at 30.  This argument does not carry weight.  The affiant — Agent Yaegar — explains how, based on his training and experience, carjackers are likely to use cell phones in furtherance of their crimes and that they carry their cell phones on their person or in a very close vicinity.  DI 211-1 at 28; DI 211-2 at 24 (ECF).  Agent Yaegar also observes that cell phones are almost ubiquitous in society and thus it is likely that the perpetrators were using and/or registering with the cell tower providing service in the general geographic area of the crimes.  DI 211-1 at 28-29.  These are exactly the types of "reasonable inferences that the officer is permitted to make" in writing up a probable cause affidavit.  *United States v. Yusuf*, 461 F.3d

18

374, 390 (3d Cir. 2006). Furthermore, "judges [are] not required to check their common sense at the door and ignore the fact that most people compulsively carry cell phones with them all the time." *United States v. James*, 3 F.4th 1102, 1105 (8th Cir. 2021) (citation modified). Therefore, the warrants contained sufficient probable cause.

### ii. Particularity

In addition to probable cause, the Fourth Amendment requires warrants to "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The particularity requirement rebuffed the "general warrants" of the colonial era, which "specified only an offense . . . and left to the discretion of the executing officials the decision as to which persons should be arrested and which places should be searched." *Steagald v. United States*, 451 U.S. 204, 220 (1981); *see also Carpenter,* 585 U.S. at 303. Thus, warrants today must "limit[] the authorization to search to the specific areas and things for which there is probable cause to search." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987). Still, we are "not obliged to be hyper-technical or overly demanding in [our] review of the degree of specificity of descriptions of the goods to be seized or the locations to be searched, as long as the descriptions are commensurate with the circumstances." *United States v. Rodriguez-Jimenez*, No. CRIM.A. 07-352-3, 2009 WL 1175617, at *4 (E.D. Pa. Apr. 30, 2009); *see also Yusuf*, 461 F.3d at 395 ("[T]he breadth of items to be searched depends upon the particular factual context of each case and also the information available to the investigating agent that could limit the search at the time the warrant application is given to the magistrate.").

Mr. McCracken argues that the geofence and tower dump warrants lack particularity because they do not name specific people to search but rather allowed the FBI to examine information from every device that interacted with a cell tower within certain temporal and

geographical parameters of the carjackings and related incidents.  DI 204 at 19-20.  He says that this type of search violates the holding from *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979), where the Supreme Court ruled that, "Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person."  Mr. McCracken also relies on the Fifth Circuit's holding in *Smith*, where the court found a Google geofence search to be akin to a modern-day general warrant prohibited by the Fourth Amendment.  *Smith*, 110 F.4th at 840.

As a starting point, there is no question that these searches returned records of people uninvolved in the carjackings — hundreds or thousands of them.  But an incidental burden on the privacy rights of innocent people is insufficient to make Mr. McCracken's point.[16]  After all, the Fourth Amendment requires government searches to be *reasonable*, not perfect, *see Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 652 (1995), and it has become fairly common today for government searches to have some understood collateral effects.  Other federal district courts evaluating tower dump and geofence searches have recognized this.  *See Arson Investigation*, 497 F. Supp. 3d at 361 ("[W]hen a court authorizes the search of a house, the entire house is subject to the search, and this includes the most private areas of a house, such as bedrooms and

---

[16] Whether Mr. McCracken has standing to challenge the privacy rights of others implicated in the searches is a difficult issue that has divided courts.  *Compare Sherod*, 2025 WL 1736279, at *5 ("While it is beyond dispute that the information collected in the tower dump included phone numbers other than those appearing at multiple burglary sites at the times of the burglaries, [the defendant] lacks standing to challenge the privacy interests of those unspecified persons."), *with Smith*, 110 F.4th at 831 n.5 (Holding that the defendants whose identities were discovered through the geofence warrant had standing to challenge the warrant's overall constitutionality).  Here, we may simply assume that Mr. McCracken has standing.  *See James* 3 F.4th at 1106 n.3 (citing *Byrd v. United States*, 584 U.S. 395, 411 (2018) ("Fourth Amendment standing . . . is not a jurisdictional question and hence need not be addressed before addressing other aspects of the merits of a Fourth Amendment claim.").

bathrooms, of individuals who may not be involved in the crime but who nonetheless live in the premises, such as spouses and children."); *Matter of Search of Info. that is Stored at Premises Controlled by Google LLC*, 579 F. Supp. 3d 62, 84 (D.D.C. 2021) (*"*[F]or nearly every suspect's text or email account lawfully seized . . . there are frequently other innocent and uninvolved persons whose privacy is compromised.") (citation modified); *Sherod,* 2025 WL 1736279, at *5 ("[I]nvestigators reviewing surveillance camera footage from a commercial robbery are likely to view others on the footage who were going about their ordinary business."). Thus, "[t]he proper line of inquiry is not whether a search of location data could [affect] even one uninvolved person's privacy interest, but rather the reasonableness of the search, the probability of finding evidence at the location, and the particularity of the search request." *Arson Investigation*, 497 F. Supp. at 362.

Here, we are satisfied that the government reasonably constrained these warrants both geographically and temporally to maximize the chance of catching the perpetrators' cell phone records and minimize unnecessary data collection. Geographically, the warrants were limited to either nearby cell towers (in the case of the tower dump) or distances of 0.2-0.5 miles away from 20 locations intimately connected to the carjackings. Temporally, the searches were limited to 20-30 minutes to capture the lead up to the carjacking and the carjackers' activity in the immediate aftermath. DI 238 at 183-85. Courts have upheld tower dump and geofence warrants under similar constraints. *See James*, 3 F.4th at 1106 (finding a tower dump search was sufficiently particularized when confined to cell towers near the robbery and over a time period of 90 minutes); *Arson Investigation*, 497 F. Supp. at 357 ("The Court finds that the [geofence] warrant in this case particularly describes the place to be searched because it narrowly identifies

the place by time and location and is also not overbroad in scope."); *United States v. Rhine,* 652 F. Supp. 3d 38, 82-88 (D.D.C. 2023).

Furthermore, we do not find *Ybarra* or *Smith* particularly helpful for Mr. McCracken because those cases dealt with searches more intrusive than those at issue here. The Supreme Court has long made clear that the government must provide greater justifications for searches and seizures that more profoundly affect people's privacy rights. *See Chambers v. Maroney,* 399 U.S. 42, 48 (1970) ("In terms of the circumstances justifying a warrantless search, the Court has long distinguished between an automobile and a home or office."); *Maryland v. King*, 569 U.S. 435, 448 (2013) ("[The] application of traditional standards of reasonableness requires a court to weigh the promotion of legitimate governmental interests against the degree to which the search intrudes upon an individual's privacy.") (citation modified).

*Ybarra* involved the physical search of people, which is obviously an intrusive search and thus requires "probable cause particularized with respect to that person." *Ybarra*, 444 U.S. at 91. But there is no apparent reason to hold the government to the same standard of particularization for a body search as for a search of anonymous phone records in possession of a third-party company. *See Sherod,* 2025 WL 1736279, at *5 ("On that sliding scale, the search of a person is highly intrusive. Obtaining targeted phone records from a third-party phone provider is not.").

Similarly, *Smith* dealt with a Google geofence search, which allows the government to locate phones to a much greater degree of precision than a tower dump or cellular geofence. DI 238 at 139-140. Also significant in *Smith* is that law enforcement had fewer guardrails for accessing Google's data than were in place here. In *Smith*, once Google sent over an initial list of anonymous device IDs within the geofence's perimeter, law enforcement (without another

warrant) compelled Google to produce additional information about these devices for purposes of verifying their relevance. *Smith*, 110 F.4th at 828. Then, once the Government was confident these devices were targets, it (again without another warrant) had Google produce the devices' subscriber identities. *Id.* Here in contrast, once the government received the initial list of anonymous IDs from T-Mobile, it did not try to compel T-Mobile to turn over any additional identifying information without first returning to a magistrate judge and persuading the judge that there was probable cause that these devices belonged to perpetrators of a crime.[17] *See* DI 211-3; DI 211-4. Thus, these warrants were sufficiently particularized to the searches performed.

### iii. Execution of the Warrant

Finally, we address the execution of the warrant: namely T-Mobile's overproduction of records. As detailed above, T-Mobile returned some user data that was outside the boundaries of the geofence warrant, fairly read. The exact amount is disputed, with Mr. McCracken alleging error rates ranging from 3% to 9% for the first five locations and the government challenging Mr. McCracken's methods and his results. To be sure, the government scored some points in its critique of Cornerstone's analysis. But we need not settle the score because even if we accept the defense's figures as true, these errors do not establish a violation of Mr. McCracken's constitutional rights.

---

[17] Mr. McCracken tries to counter this point by arguing that the geofence warrant cast suspicion on any phone record appearing at two or more of the target locations. DI 204 at 11; DI 211-2 at 31 (ECF). But there is no evidence that the government took further investigative steps against anyone beyond Mr. McCracken and Mr. Muse. In fact, Agent Guagliardo testified that there were no such misguided investigative steps. *See* DI 238 at 179.

The *Arson* court provides persuasive guidance in dealing with a similar issue of a Google geofence warrant capturing data outside the target perimeter.  The court recognized that "the Fourth Amendment deals in probabilities and reasonableness . . . [t]hus, the fact that warrants for location data have margins of error does not invalidate them — only reasonableness is required[.]"  *Arson Investigation*, 497 F. Supp. at 361; *see also Brinegar v. United States,* 338 U.S. 160, 176 (1949) ("Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability."); *Garrison*, 480 U.S. at 87 ("[T]he Court has [] recognized the need to allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing search warrants.").

Here, we are persuaded that Agent Yaegar acted reasonably in designing a warrant that T-Mobile could comply with, and that any mismatch between what the warrant called for and what T-Mobile returned was the result of, at most, an honest mistake.  Three facts in particular guide our thinking.  First, Mr. McCracken's harshest attack alleges an overproduction rate for the first five locations of less than 10%, and thus there was no major divergence between what the warrant called for and what T-Mobile returned.[18]  Second, Agent Yaegar credibly testified that he was unaware of how T-Mobile's internal data practices could pose challenges in complying

---

[18] There is nothing magical about 10%, and assessing overproduction errors should be highly contextual.  Here, in the context of these particular tower dump and geofence warrants, the alleged error numbers are so low as to be almost nominal.

with the warrant's language.[19]  DI 238 at 217-18.  Finally, there is no evidence that Mr.
McCracken or Mr. Muse's records were returned outside the warrant's geofence boundaries, and
therefore law enforcement did not take further investigative steps against anyone included in the
overproduction.

### C.  Whether the warrants were protected by good faith

Lastly, even if the tower dump and geofence warrants were deficient — and they are not
— the good faith exception to the warrant requirement shields the resulting evidence from
suppression.  "The good faith exception instructs that suppression of evidence is inappropriate
when an officer executes a search in objectively reasonable reliance on a warrant's authority."
*United States v. Hodge*, 246 F.3d 301, 307 (3d Cir. 2001) (citation modified).  The mere
existence of a warrant typically proves that an officer acted in good faith, however there are at
least four unusual situations where an officer's reliance on a warrant does not trigger this
exception: (1) when the magistrate judge issued the warrant in reliance on a deliberately or
recklessly false affidavit; (2) when the magistrate judge abandoned her judicial role and failed to
perform her neutral and detached function; (3) when the warrant was based on an affidavit so
lacking in indicia of probable cause as to render official belief in its existence entirely

---

[19] With the benefit of hindsight, it might have been better if Agent Guagliardo had
educated Agent Yaegar during the investigation about how T-Mobile searches its records.  After
all, the two agents were working on the same team.  But there is also no evidence that Agent
Guagliardo withheld this information in bad faith.  Rather, it is likely that Agent Guagliardo did
not appreciate the legal significance of this information at the time and believed T-Mobile's
returns would be fully responsive to the warrant.  DI 238 at 213; *see also United States v. Stearn,*
597 F.3d 540, 561 (3d Cir. 2010) ("[W]e neither expect nor require police to perform complex
legal analysis in the field, for they are untrained in the law and are often called to make hurried
judgments.") (citation modified).  As we mentioned earlier, Agent Guagliardo seemed genuinely
taken aback by the notion that the warrants were facially calling for something different (circles)
than what T-Mobile would gather (squares).

unreasonable; and (4) when the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized. *Id.* at 308.

Starting with the first exception, Mr. McCracken contends that Agent Yaegar misled the magistrate judge because he "knew or should have known" that T-Mobile's methodology for complying with the geofence warrant increased the likelihood that phones outside the geofence would be examined. DI 213 at 9 (ECF). However, as we have explained, Agent Yaegar credibly testified that when he was writing up the affidavit, he was unaware of T-Mobile's internal methods for responding to a geofence warrant. DI 238 at 217-18. Although it might have been better if Agent Yaegar had been aware of that information, it goes too far to say that he *should* have known, because he was not a member of the CAST team and geofencing was a relatively new technology at the time. DI 238 at 206. And even if Agent Yaegar had known about T-Mobile's search practices, it is far from clear that his failure to fully account for T-Mobile's practices in the warrant would make his affidavit "deliberately or recklessly false." After all, the records that T-Mobile turned over to the government were largely responsive and "'surgical precision' [in a warrant] is not required." *Matter of Search of Info. Stored at Premises Controlled By Google*, No. 2:22-MJ-01325, 2023 WL 2236493, at *12 (S.D. Tex. Feb. 14, 2023) (quoting *Arson Investigation*, 497 F. Supp. 3d at 360-61).

Nor has Mr. McCracken shown that any of the other three exceptions to good faith are present. There is no evidence that Judge Wells failed to perform her neutral and detached function. And for the last two exceptions, Mr. McCracken would have to demonstrate "not just that the Magistrate Judge erred in issuing the search warrant at issue, but that the Magistrate Judge's error was so obvious that a law enforcement officer, without legal training, should have

realized, upon reading the warrant, that it was invalid and thus should have declined to execute it." *United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars & Fifty-Seven Cents ($92,422.57)*, 307 F.3d 137, 146 (3d Cir. 2002).  Mr. McCracken cannot meet this high bar.  As explained above, the tower dump and geofence affidavits contained ample evidence explaining the nexus between the carjackings and the target locations, and the warrants were constrained both geographically and temporally.  Furthermore, there is no Third Circuit precedent holding that the affidavits as written were constitutionally infirm, and to the contrary, many courts have upheld similar tower dump and geofence warrants.  *See e.g. James*, 3 F.4th at 1105; *Rhine*, 652 F. Supp. 3d at 90.  These holdings "underscore why a reasonable officer charged with executing the warrant would have had no basis to conclude that the search was illegal despite the magistrate's authorization."  *United States v. Savage,* No. CR 23-454, 2024 WL 3295586, at *4 (E.D. Pa. July 3, 2024) (citation modified).  Thus, the good faith exception applies.[20]

## V.    CONCLUSION

For the foregoing reasons, Mr. McCracken's motion to suppress is denied.[21]  An appropriate order follows.

---

[20] Since we find these warrants are constitutional and that, regardless, good faith precludes their suppression, we decline to consider the government's arguments on inevitable discovery.

[21]  As a point of additional clarity, the section of Mr. McCracken's motion aimed at suppressing evidence from the historical cell site warrant is also denied because his argument is premised on this warrant being the fruit of the poisonous tree of the tower dump and geofence warrants.  DI 204 at 26-28.