**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| **v.** | : | **NO. 24-3-1, 2, 3, 4, 5** |
| | : | |
| **MIKAL MCCRACKEN, AMIN MUSE, ALEEM ABDUL-HAKIM, DEAN FOSQUE, KAVON COLEMAN** | : | |

**MEMORANDUM**

**MURPHY, J.** **September 1, 2026**

Following a two-month trial, on March 19, 2026, a jury convicted Mikal McCracken, Amin Muse, Aleem Abdul-Hakim, Dean Fosque, and Kavon Coleman on dozens of charges related to a large-scale carjacking conspiracy culminating in two murders. All defendants now move for new trials under Federal Rule of Criminal Procedure 33, and Mr. Coleman also moves for a partial judgment of acquittal under Federal Rule of Criminal Procedure 29.

Mr. McCracken, Mr. Muse, Mr. Abdul-Hakim, Mr. Fosque, and Mr. Coleman contend that they were prejudiced by not having sufficient time to analyze the government's summary exhibits before the exhibits were presented to the jury. Mr. Fosque and Mr. Coleman also argue that we erred in denying their pre-trial motions to sever. Finally, Mr. Coleman raises several other grounds for a new trial and argues that the government advanced insufficient evidence to convict him on the conspiracy count and for three substantive carjacking counts.

We acknowledge that this trial presented unusual challenges because of the scope of the charged conspiracy. But it is hard to fault the government for these challenges, which originate in the extensive criminal conduct, not mere litigation tactics. The government backed up the daunting indictment with a remarkably organized and information-dense trial, and we grant new trials only when "there is a serious danger that a miscarriage of justice has occurred—that is, that

an innocent person has been convicted." *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002) (citation modified), or when evidentiary errors "so infected the jury's deliberations that they had a substantial influence on the outcome of the trial." *United States v. Thornton*, 1 F.3d 149, 156 (3d Cir. 1993) (citation modified). We grant judgments of acquittal only when the government's evidence, when viewed in the light most favorable to the prosecution, was insufficient for "*any* rational trier of fact [to] have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Here, the defendants' motions fall well short of these standards and therefore we deny them.

## I. BACKGROUND

On July 24, 2024, a grand jury returned a superseding indictment against defendants Mikal McCracken, Amin Muse, Aleem Abdul-Hakim, Dean Fosque, Kavon Coleman, Amadou Moussa, and Davon Squire, arising from a carjacking conspiracy lasting from October 2021 to October 2022. DI 68.[1] The crimes charged include dozens of completed gunpoint carjackings, attempted but unsuccessful carjackings, murder of a carjacking victim, murder of a potential witness, identify theft, and a scheme to export carjacked and stolen cars for sale in Africa. DI 595 at 2. The conspiracy was started by Jonathan Akubu, charged elsewhere, and Mr. Fosque. *Id*. at 3. Mr. Fosque then recruited his younger brother, Mr. McCracken, who in turn brought in his friends Mr. Muse, Mr. Abdul-Hakim, and Mr. Coleman.[2] *Id.* Mr. Moussa and Mr. Squire allegedly joined the conspiracy through Mr. Akubu and are primarily charged with conduct related to the scheme to export the stolen cars to Africa. DI 68.

---

[1] We adopt the sequential pagination supplied by the CM/ECF docketing system.

[2] Mr. McCracken also recruited his friend Eniamaj Lee who is charged elsewhere.

The first murder occurred on February 6, 2022, when Mr. McCracken, Mr. Muse, and Mr. Abdul-Hakim, along with Mr. Akubu, carjacked George Briscella, and shot and killed him in the process. DI 595 at 2. In their haste to flee the scene in Mr. Briscella's car, the carjackers failed to take his key fob, which they needed to operate the car. *Id.* They enlisted the help of a locksmith, Aiah Gbessay, to make them a new key. But then, on February 12, the police recovered Mr. Briscella's car. Members of the conspiracy, including Mr. McCracken, Mr. Muse, and Mr. Akubu, feared that Mr. Gbessay would be identified through forensics by law enforcement since he touched the car while making the replacement key, and so they murdered him on February 12, 2022. *Id.*

Soon after the second murder, the Federal Bureau of Investigation (FBI) and local law enforcement identified the carjackers, culminating in an indictment naming Mr. McCracken, Mr. Muse, Mr. Abdul-Hakim, and Mr. Fosque in January 2024. *See* DI 1. Then in July 2024, the government brought a superseding indictment that additionally charged Mr. Coleman, Mr. Moussa, and Mr. Squire. DI 68.

As the case proceeded to trial, the government passed more than 50 productions during discovery, with the most relevant productions to the defendants' post-trial motions as follows:

- Production 1 included the government's initial grand jury PowerPoint, a deck of 209 electronic slides that summarized evidence and also displayed the content of messages and other evidence from phone extractions and other materials as to each criminal event that would later be included in the government's trial PowerPoints. Production 1 was passed on March 18, 2024, to Mr. McCracken, Mr. Muse, and Mr. Fosque, and on August 7, 2024, to Mr. Coleman. DI 595 at 3.

- Production 7 included all defendants processed phone extractions. Production 7 was passed on September 19, 2024. *Id.*
- Production 10 included the government's superseding grand jury PowerPoint presentation. Production 10 was passed on October 8, 2024. *Id.* at 4.
- Production 12 included surveillance video and GPS data from the crimes charged. Production 12 was passed on November 20, 2024. *Id.* at 14.
- Production 13 included an initial re-processing of Mr. McCracken's phone and Production 14 included the raw imagining of all phone extractions to allow the defendants to process the phones themselves. Productions 13 and 14 were passed on December 9, 2024. *Id.* at 4.

While discovery unfolded, we decided pre-trial motions, three of which are relevant here. First, Mr. Fosque, Mr. Coleman, and Mr. Moussa moved to sever their trials (DI 202, 227, and 255). We denied these motions without prejudice, however we required the government to try only five of the defendants initially due to courtroom limitations. DI 273. The government chose to try Mr. McCracken, Mr. Muse, Mr. Abdul-Hakim, Mr. Fosque, and Mr. Coleman.

Second, the government moved to admit uncharged carjackings (among other acts) that occurred during the conspiracy. *See* DI 226. We granted this motion, finding in part that uncharged carjackings are intrinsic evidence because they directly prove count one — the overarching conspiracy — in the superseding indictment. DI 305.

Finally, Mr. McCracken moved to address the authentication and depiction of electronic content. DI 252. We denied Mr. McCracken's motion without prejudice but ordered the parties to meet and confer and agree to a system of rolling disclosures before and during trial, with the

goal being to afford defendants notice of exhibits and illustrative aids that the government would actually use at trial. DI 305. The parties worked out a system, and during trial the government sent the defendants its summary exhibits anywhere from the night before to more than a week before the government presented them to the jury. DI 595 at 4.

Trial for Mr. McCracken, Mr. Muse, Mr. Abdul-Hakim, Mr. Fosque, and Mr. Coleman began on January 20, 2026, with jury selection, and included the testimony of over 100 witnesses during an 8-week period. DI 595 at 5. The government's most prominent witness was Special Agent Matthew Yaeger, who used summary PowerPoints to highlight the government's key evidence against the conspirators. *See* DI 577 at 2-3. All told, Agent Yaeger presented sixteen slide decks, ranging in size from 61 slides to 350 slides. *Id*. The government also presented testimony from two cooperating members of the conspiracy: Mr. Akubu and Mr. Lee. On March 19, 2026, the jury returned a verdict finding all defendants guilty of all counts charged in the superseding indictment. DI 595 at 5.

## II. THE DEFENDANTS' POST-TRIAL MOTIONS

On April 27, 2026, Mr. McCracken filed a motion for a new trial pursuant to Fed. R. Crim. P. 33. DI 577. In his motion, Mr. McCracken argues that the government violated Federal Rule of Evidence 1006 and his Sixth Amendment right to cross-examination by not disclosing Agent Yaeger's summary PowerPoints with sufficient time for him to prepare a defense. *Id*.

On May 5, 2026, Mr. Muse filed a motion for a new trial pursuant to Fed. R. Crim. P. 33 arguing the same points as Mr. McCracken. DI 578.

Also on May 5, 2026, Mr. Coleman filed a motion for a judgment of acquittal as to counts 1 and 39-41 of the superseding indictment pursuant to Fed. R. Crim. P. 29 and

alternatively for a new trial as to all counts of conviction under Fed. R. Crim. P. 33. DI 579. In his motion for a new trial, he joins Mr. McCracken and Mr. Muse in arguing that he was prejudiced by the government's disclosure process for its summary PowerPoints and additionally argues: (1) we erred in not severing his trial; (2) the government improperly introduced evidence of an uncharged crime against him; (3) the government made improper arguments in its closing; and (4) we improperly admitted Mr. Coleman's prison calls and emails to his girlfriend Amiah Day. *Id.*

On May 13, 2026, Mr. Fosque filed a motion for new trial pursuant to Fed. R. Crim. P. 33. DI 580. Mr. Fosque joins the other defendants in objecting to the government's disclosure process for its summary PowerPoints and also argues that we erred in denying his pretrial motion to sever. *Id.*

On July 22, 2026, the government filed an omnibus response in opposition to Mr. McCracken, Mr. Muse, Mr. Coleman, and Mr. Fosque's post-trial motions. DI 595. Mr. McCracken and Mr. Coleman filed replies to the government's response. DI 598 and DI 604.

On August 31, 2026, Mr. Abdul-Hakim filed a motion for a new trial pursuant to Fed. R. Crim. P. 33.[3] DI 631. He joins his co-defendants in arguing that the government's disclosure process for its summary exhibits violated his right to a fair trial. *Id.*

## III. STANDARD OF REVIEW

### A. Rule 33

Under Fed. R. Crim. P. 33(a), we "may vacate any judgment and grant a new trial if the

[3] We permitted Mr. Abdul-Hakim additional time to file post-trial motions because he changed counsel. *See* DI 583 and 587.

interest of justice so requires." There are two main grounds for granting a new trial. First, we "can order a new trial on the ground that the jury's verdict is contrary to the weight of the evidence, [but] only if [we] believe[] that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted." *Johnson*, 302 F.3d at 150 (citation modified). Second, we can grant a new trial based on evidentiary errors, but "only when the errors, when combined, so infected the jury's deliberations that they had a substantial influence on the outcome of the trial." *Thornton*, 1 F.3d at 156 (citation modified). When evaluating a Rule 33 motion, we do not "view the evidence favorably to the Government, but instead exercise[] [our] own judgment in assessing the Government's case." *United States v. Salahuddin,* 765 F.3d 329, 346 (3d Cir. 2014) (citation modified). All in all, "motions for new trials are disfavored and are only granted with great caution and at the discretion of the trial court." *United States v. Martinez*, 69 F. App'x 513, 516 (3d Cir. 2003); *see also Salahuddin,* 765 F.3d at 346 ("Such motions are to be granted sparingly and only in exceptional cases.") (citation modified).

**B. Rule 29**

Under Fed. R. Crim. P. 29, we "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." In analyzing a Rule 29 motion, we ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 319. This is a "highly deferential" standard of review, and we "must be ever vigilant not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting our judgment for that of the jury." *United States v.*

*Caraballo-Rodriguez*, 726 F.3d 418, 430 (3d Cir. 2013) (citation modified). "A finding of insufficiency should be confined to cases where the prosecution's failure is clear." *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005) (citation modified).

## IV. ANALYSIS

### A. The defendants have not shown that they were sufficiently prejudiced by the rolling disclosure process to warrant a new trial under Rule 33

As mentioned above, Mr. McCracken, Mr. Muse, Mr. Abdul-Hakim, Mr. Fosque, and Mr. Coleman argue that the government's rolling disclosures violated Federal Rule of Evidence 1006 as well as their right to a full and fair cross examination of Agent Yaeger under the Sixth Amendment. We disagree. First, under Rule 1006, we "may admit as evidence a summary, chart, or calculation offered to prove the content of voluminous admissible writings, recordings, or photographs that cannot be conveniently examined in court, whether or not they have been introduced into evidence."[4] We have significant discretion in this area, *see United States v. Bansal*, 663 F.3d 634, 668 (3d Cir. 2011), but the Rule has several preconditions: "(1) the underlying documents must be so voluminous that they cannot be conveniently examined in court, (2) the proponent of the summary must have made the [underlying] documents available for examination or copying at a reasonable time and place, (3) the underlying documents must be admissible in evidence, (4) the summary must be accurate and nonprejudicial, and (5) the

[4] The parties debated during trial whether the government's PowerPoints qualified as summary exhibits under Rule 1006 or illustrative aids under Rule 107. Both sides seem to agree here that the PowerPoints at issue are summary exhibits under Rule 1006. But to the extent that they were illustrative aids, the defendants do not point to any rule of evidence, caselaw or other binding precedent requiring the government to disclose these slides earlier than they did, especially when the defendants had access to the underlying data. *See United States v. Crockett,* 49 F.3d 1357, 1361 (8th Cir. 1995) ("The use of . . . visual aids is generally permissible in the sound discretion of the trial court.").

summary must be properly introduced through the testimony of a witness who supervised its preparation." *United States v. Modena*, 302 F.3d 626, 633 (6th Cir. 2002); *see also United States v. Lynch*, 735 F. App'x 780, 785 (3d Cir. 2018).

Here, the government complied with these preconditions before introducing its summary PowerPoints. First, the underlying documents — consisting mainly of the defendants' phone extractions, surveillance video, and GPS information — were voluminous and not easily examinable in court: As Mr. McCracken highlights in his motion, the documents included hundreds of thousands of direct communications between McCracken and his co-conspirators and hundreds of thousands of rows of GPS spreadsheet records. DI 577 at 3-4. Next, the government made the underlying documents available to the defendants at a reasonable time and place: As the government points out in its opposition brief, and the defendants do not meaningfully contest, the defendants were provided with their phone extractions and the relevant GPS and surveillance video by the end of 2024. DI 595 at 14. And to the extent the defendants take issue with the government's presentation of cell-site data, the government turned over the Cellular Analysis Survey Team (CAST) Reports on February 24, 2025, and disclosed a supplemental report on January 13, 2026. *Id*. Finally, the defendants make no argument here that the underlying documents were inadmissible, that the summaries were inaccurate, or that the summaries were not properly introduced by Agent Yaeger.

Instead, the defendants contest that they had no realistic prospect of verifying the accuracy of the summary PowerPoints because many of the slideshows were provided to them the night before they were presented to the jury. This argument carries some intuitive appeal, but we reject it for several reasons.

First, Rule 1006 does not require that the moving party disclose the summaries themselves prior to trial. *See United States v. Jamieson*, 427 F.3d 394, 409 (6th Cir. 2005) ("Rule 1006 does not require, however, that the government provide [the defendant] with a copy of the actual summary."). Second, as explained above, the government's slides were not "new" information, because the defense possessed the underlying data well before trial. True, discovery in this case was voluminous, and we acknowledge that defense attorneys appointed under the Criminal Justice Act (CJA) face a significant resource imbalance against the government. But this resource gap was partially mitigated by the fact that the defendants retained forensic firms to analyze the raw data.[5]

Third, while we do not have a complete record on this, some of Agent Yaeger's PowerPoints were disclosed significantly earlier than the night before their presentation to the jury. For example, the Group A slides — concerning the attempted carjacking of Bamakan Cissoko and the carjacking and murder of Mr. Briscella — were disclosed as early as January 24, 2026 (*see* DI 455) and were not presented to the jury until February 5, 2026. *See* DI 481 at 170-71.

Fourth, the government included citations to the underlying data within the slides themselves, allowing for the defense to more easily verify the slides' accuracy during trial. Here is one of many examples below:

[5] We also note, as the government points out, that the defendants could have asked for additional CJA funding under 18 U.S.C.§ 3006A(e)(3) to help review the underlying data.

Phone Activity 2/6/2022 after 2:00 p.m.

| Time | Type | From | To | Content/Duration (m:ss) |
|---|---|---|---|---|
| 4:40:05 p.m. | Call | Akubu phone 1 484-724-8677 | McCracken phone 267-270-8785 | 4:16 |
| 4:44:53 p.m. | Text | McCracken phone 267-270-8785 | Lee phone 445-208-9810 | Wya ? Jrock need us |
| 4:44:58 p.m. | Call | Akubu phone 1 484-724-8677 | Muse phone 252-258-1024 | 1:32 |
| 4:45:03 p.m. | Text | McCracken phone 267-270-8785 | Lee phone 445-208-9810 | The bitch with the range moving |

Source: 267-270-8785 and 252-258-1024 T-Mobile records (calls), McCracken and Lee phone extractions (texts) 11

Group A Slide 11.

Fifth, the government made Agent Yaeger available for cross-examination on any issue about any previously presented PowerPoint at any time during the six-weeks of trial testimony. DI 518 at 272-73. None of the defendants took Agent Yaeger up on this offer. *See United States v. Bray*, 139 F.3d 1104, 1110-11 (6th Cir. 1998) ("At the government's suggestion, the court offered the defense the opportunity to reopen proofs to present any challenge it wished to the foundation for the [summary] exhibits but defense counsel declined. This opportunity was sufficient to mitigate any prejudice that might have resulted from untimely disclosure.").

Sixth, the defendants did not ask us for more time to analyze any of the summary PowerPoints at trial, when we could have fashioned a less draconian remedy.[6]

[6] As an example, when Mr. McCracken brought to our attention that the government had supplemented its CAST report on the eve of trial (*see* DI 423), we ruled that the government could not present the new sections of the report to the jury until the defense had adequate time to verify the new material.

Finally, and importantly, to this day the defendants have not raised any significant discrepancies between the underlying data and the government's summaries that suggests they were prejudiced by the summaries. *See Bray*, 139 F.3d at 1111 (Concluding that the government did not commit reversible error by admitting the government's summary exhibits in part because "even now [the defendant] does not contend that the summaries did not accurately represent the information on the [underlying data], nor does [the defendant] explain how timely disclosure would have made a difference."). Rather, every indication is that the slides accurately reflected the data in every material respect time and time again. And the reality of this trial is that there was an overwhelming amount of evidence because the government charged, and proved to a jury's satisfaction, an overwhelming amount of criminal activity. Thus, we are unpersuaded that a new trial is in the interest of justice.

The defendants cite to *United States v. Bortnovsky*, 820 F.2d 572 (2d Cir. 1987) to support their case, but that was a very different situation. In *Bortnovsky*, the defendant was charged with filing fraudulent burglary claims, but the indictment did not specify the dates of the staged burglaries or enumerate which of numerous documents the government claimed that the defendants falsified. *Id.* at 574. The defendants then moved for a bill of particulars to identify this information, which the court denied. On appeal, the Third Circuit found that the district court's denial of a bill of particulars was reversible error as the indictment standing alone left the government's case "shrouded in mystery." *Id.* at 575.

Here in contrast, the government provided the defense with a superseding indictment that laid out the dates and descriptions of the charged crimes, *see* DI 68, and further disclosed the key evidence in its case through its grand jury PowerPoints. Thus, the defense did not have to guess

how to prepare for trial. *See United States v. Cammarata*, No. CR 21-00427-01, 2022 WL 7127565, at *5 (E.D. Pa. Oct. 12, 2022) ("The facts of *Bortnovsky*, are thus, distinguishable from the present case because, here, there is no mystery as to [the government's case]").[7]

We also reject the defendants' argument that they were deprived of their right to meaningfully cross-examine Agent Yaeger on his summary PowerPoints. "The Confrontation Clause provides two types of protections for a criminal defendant: the right physically to face those who testify against him, and the right to conduct cross-examination." *Preston v. Superintendent Graterford SCI*, 902 F.3d 365, 380 (3d Cir. 2018) (citation modified). Additionally, "[a] criminal defendant's right to cross-examination is not satisfied simply because a witness appears and takes the stand at the defendant's trial. A criminal defendant is also entitled to a full and fair opportunity to probe and expose the infirmities of the witness's testimony." *Id.* (citation modified). Still, "the Confrontation Clause guarantees only an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *United States v. Owens*, 484 U.S. 554, 559 (1988) (citation modified).

Here, we are persuaded that the defendants had a full and fair opportunity to cross-examine Agent Yaeger on his summary slides. Agent Yaeger made himself available for cross-

---

[7] The defendants also cite to *Emmett v Ricketts*, 397 F. Supp. 1025 (N.D. Ga. 1975), but that case is equally inapplicable here. In *Ricketts*, the court granted a defendant's habeas petition after the prosecutor, in connection with a *Brady* claim, "dump[ed]" a voluminous mass of evidence on a trial judge for in camera review and refused to spell out "possible areas of materiality." *Id*. at 1043. Here in contrast the defendants do not allege that the government hid or withheld *Brady* material. Nor did the government "dump" discovery materials in an unusable form. Rather, the government turned over its discovery in increments, with the defense having, in many cases, more than a year to digest the material before trial. And at no point did anyone suggest that the discovery information was unusable.

examination by all defendants after each of his presentations, and from our vantage point at trial, the defendants demonstrated a keen eye for detail and effectively cross-examined Agent Yaeger, bringing even small inaccuracies in his slides to the attention of the jury. Here is one example of many:

> McCracken Counsel: Now, did you admit error today in front of the jury about the phone attribution to this number?
>
> Agent Yaeger: The phone attribution to this number?
>
> McCracken Counsel: Yeah.
>
> Agent Yaeger: No, I admitted that the bottom line where I say where this -- actually the data actually comes from, I have incorrectly listed. It's from -- it should be from the (445) 208-9810 T- Mobile. I was moving things around in these slides and forgot to change the bottom line.
>
> McCracken Counsel: I understand that, but so there was a mistake in your -- and I'm not challenging you because that took integrity to bring that error to the attention of the jury five minutes before the break when everybody's tired and never would've picked that up.
>
> Agent Yaeger: When I make a mistake, I admit it.
>
> McCracken Counsel: Sure.
>
> Agent Yaeger: I don't like to make mistakes, but I'm human and I make them.
>
> McCracken Counsel: Excellent. I mean that's true because you also made a mistake during the first day of your testimony regarding the Hakeem phone interchange with the Akubu phone, and you clarified that also for the jury; is that correct?
>
> Agent Yaeger: I did. Yes. I had those things transposed and I -- again, not happy with myself, but they happened.

DI 518 at 234-235.

The defendants also cross-examined Agent Yaeger about his quality control process for making his summary slides:

> McCracken Counsel: Well, so what percentage of records would you say that you haven't reviewed?
>
> Agent Yaeger: It's not a matter of having reviewed, it's a matter of having gone through a third time is what I mean.
>
> McCracken Counsel: Oh, a third time?
>
> Agent Yaeger: Yes.
>
> McCracken Counsel: Okay. So -- okay. So even though you've gone through two times at least, obviously there's still mistakes that are made?
>
> Agent Yaeger: Occasionally, yes. And again, there's massive amounts of data here. It's massive amounts of records. You have all the records I have. If there's anything you've gotten wrong, please bring it to my attention, I'm happy to go through it. But I've done everything I can to make sure that this is accurate.

DI 518 at 238. Thus, we see no evidence in the record, nor do the defendants cite any relevant authority, that the government committed a confrontation clause violation. Overall, the defendants have not carried their burden in showing that they are entitled to a new trial based on the government's disclosure process for its summary slides.

**B. Mr. Fosque and Mr. Coleman have not shown that our denial of their severance motions warrants a new trial under Rule 33**

Mr. Fosque and Mr. Coleman additionally contend that they are entitled to a new trial under Rule 33 because we erred in denying their motions to sever. *See* DI 273. Specifically, Mr. Fosque argues that he was prejudiced because: (1) he was a more limited member of the conspiracy because he was charged as a principal in only nine out of 28 of the substantive carjacking counts and was not charged with the murders; (2) the large amount of cellphone data made it difficult for the jury to compartmentalize the evidence; and (3) the jury likely inflated his role in the case because he is the brother of the lead defendant, Mr. McCracken. *See* DI 580 at 2-11. Mr. Coleman in turn argues that he is entitled to a new trial because the government

presented weeks of evidence related to substantive crimes with which he was not charged, thus subjecting him to prejudicial spillover. *See* DI 579 at 16-22.

We disagree. Federal Rule of Criminal Procedure 14(a) allows us to sever a criminal trial when "joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant or the government." The risk of prejudice varies with the facts in each case, and "Rule 14 leaves the determination of [this risk] and any remedy that may be necessary to the sound discretion of the district courts." *Zafiro v. United States*, 506 U.S. 534, 541 (1993).

Importantly, "a defendant seeking a new trial due to the denial of a severance motion must show that the joint trial led to clear and substantial prejudice resulting in a manifestly unfair trial." *United States v. Scarfo*, 41 F.4th 136, 182 (3d Cir. 2022) (citation modified). This is "a demanding standard that requires more than mere allegations of prejudice." *Id.* (citation modified). The defendants "are not entitled to severance merely because they may have [had] a better chance of acquittal in separate trials." *United States v. John-Baptiste*, 747 F.3d 186, 197 (3d Cir. 2014) (citation modified). Rather, the critical issue is "whether the jury [was] able to compartmentalize the evidence as it relates to separate defendants in view of its volume and limited admissibility." *Id.* (citation modified). "In short, the bar [for severance] is high and reflects the preference in the federal system for joint trials of defendants who are indicted together." *United States v. Savage*, 85 F.4th 102, 118 (3d Cir. 2023) (citation modified).

Reflecting on how the trial unfolded, we are satisfied that we correctly denied both Mr. Fosque and Mr. Coleman's motions to sever. In denying Mr. Fosque's original motion to sever, we reasoned that "there is little for the jury to exaggerate [as to Mr. Fosque's role in the conspiracy] because Mr. Fosque's alleged participation in the conspiracy was extensive . . . Mr.

Fosque devised the carjacking scheme with Mr. Akubu, and [] Mr. Fosque recruited Mr. McCracken. Mr. Fosque also is charged as a principal in nine carjackings, many of which involved shootings of victims." DI 273 at 3 (internal citations omitted). Similarly in denying Mr. Coleman's initial motion to sever, we reasoned that while his charged conduct was confined to a period of several hours, "he was quite active during this period: Mr. Coleman allegedly participated in three gunpoint carjackings and one attempted gunpoint carjacking where a victim was shot." *Id.* at 3-4. In sum, we concluded that because both men are "charged with grave crimes in furtherance of this conspiracy . . . the chance that any of them will suffer from a prejudicial spillover of evidence is minimized."[8] *Id.* at 4.

We remain confident that the jury was able to compartmentalize the evidence as to both Mr. Fosque and Mr. Coleman. The government presented its evidence in a straightforward manner, with each charged crime organized into groups A to N. For example, Group A focused on the two charged crimes on February 6 — the attempted carjacking of Mr. Cissoko and the carjacking and murder of Mr. Briscella — while Group B focused on the murder of Mr. Gbessay on February 12. At the end of the government's presentation of evidence for each group, Agent Yaeger then summarized the government's key evidence using the slides discussed at length

[8] We also explained that even if these defendants were tried individually, the government could still introduce much of the same evidence as it would at a joint trial. This is because these defendants were charged with conspiracy, and statements and acts committed by one co-conspirator in furtherance of the conspiracy are often admissible against all co-conspirators. *See* Fed. R. Evid. 801(d)(2)(E); *United States v. Hart*, 273 F.3d 363, 370 (3d Cir. 2001) ("[Because the defendants] were charged under the same conspiracy, acts committed by one in furtherance of the conspiracy were admissible against the other."); *United States v. Tutis*, 167 F. Supp. 3d 683, 693 (D.N.J. 2016). Mr. Fosque and Mr. Coleman continue to have no rebuttal to this point.

above, and these slides illustrated (along with his testimony[9]) which defendants were charged with which incident. An example from Group A displaying the defendants charged with the attempted carjacking of Mr. Cissoko is shown below:




Group A Slide 1.

Furthermore, while we acknowledge that the government's cell-phone and other electronic evidence was vast, the government presented this evidence in a clear manner, with each incriminating text message labeled with the name of the defendant who sent it. An example of this organization is shown above in our screenshot of Group A Slide 11.

Additionally, at numerous points throughout trial testimony, Mr. Coleman and Mr. Fosque's lawyers elicited testimony to make it clear when their clients were not charged with specific counts. Below are a few examples:

---

[9] *See e.g.* DI 481 at 171-173; DI 482 at 111-112.

> Coleman's Counsel: Good afternoon. Just to recap, my client, Kavon Coleman, he's not charged with any of the murders in this case that we've been hearing about, correct?
>
> Agent Yaeger: That is correct, yes.
>
> Coleman's Counsel: And he's not charged with any carjackings prior to January 27th?
>
> Agent Yaeger: He's not charged with any carjackings -- substantive counts of carjacking prior to January 27th.
>
> Coleman's Counsel: And the same would be true of post January 28th?
>
> Agent Yaeger: That is correct, yes.

DI 476 at 210.

> Coleman's Counsel: . . . Just to be clear, Mr. Coleman has not been charged with any crimes in Group H, which we discussed, which you have been on the stand discussing for quite some time, correct?
>
> Agent Yaeger: That is correct. He has not been charged with any crimes, no.
>
> Coleman's Counsel: And likewise, he was not charged with any crimes in Group A?
>
> Agent Yaeger: That is correct, yes.
>
> Coleman's Counsel: B?
>
> Agent Yaeger: Correct. Yes.
>
> Coleman's Counsel: C?
>
> Agent Yaeger: Correct.
>
> Coleman's Counsel: D?
>
> Agent Yaeger: Yes. The only group that has substantive charges involving Kavon Coleman is Group K, in addition to the conspiracy charge.
>
> Coleman's Counsel: And since you brought up the conspiracy charge, he has not been charged in any overt acts up until this point, a -- let me strike that, rephrase

> that question. The overt acts discussed so far, A, B, C, D, E, F, G, H, he has not been charged in any overt acts with respect to those.
>
> Agent Yaeger: Correct, yes.

DI 498 at 25-26.

> Fosque's Counsel: I have very few questions for you. I just want to be crystal clear. My client, Mr. Fosque, was arrested on January 21, 2022, correct?
>
> Agent Yaeger: Yes.
>
> Fosque's Counsel: After that time, he was involved in no further carjackings that were charged in this case. Is that fair to say?
>
> Agent Yaeger: Dean Fosque was not physically available to be at any carjacking. He was not available, not involved.
>
> Fosque's Counsel: And that includes Group I, Group J, Group K, Group L, and then your testimony today about Group M, correct?
>
> Agent Yaeger: Correct, yes.

DI 520 at 84.

Finally, we instructed the jury to decide each defendant's guilt individually. Below is the key part of our instruction on this matter:

> Also in our system of justice, guilt or innocence is personal and individual. You must separately consider the evidence against each defendant on each offense charged and you must return a separate verdict for each defendant on each offense.
>
> For each defendant and offense, you must decide whether the Government has proved beyond a reasonable doubt that the particular defendant is guilty of a particular offense.
>
> Your decision on any one defendant or any one offense whether guilty or not guilty should not influence your decision on any of the other defendants or other offenses. Each offense and each defendant should be considered separately.

DI 537 at 25-26.

"We presume that the jury followed [these] instructions and thus we regard the

instructions as persuasive evidence that refusals to sever did not prejudice the defendants." *United States v. Lore*, 430 F.3d 190, 206 (3d Cir. 2005) (citation modified); *see also United States v. Voigt*, 89 F.3d 1050, 1096 (3d Cir. 1996) ("The limiting instructions that the district court gave to the jury reinforce our conclusion [to affirm the district court's denial of severance]"). All in all, Mr. Fosque and Mr. Coleman do not articulate clear and substantial prejudice from the joinder of their trial and thus we deny their Rule 33 motions on this ground.

### C. Mr. Coleman has not shown that he is entitled to a new trial under Rule 33 on other grounds

Mr. Coleman moves for a new trial on several additional grounds, none of which is meritorious.

#### a. The January 18th Carjacking

Mr. Coleman first argues that he is entitled to a new trial because the government did not give him pre-trial notice under Federal Rule of Evidence 404(b) that it intended to introduce evidence of his participation in the carjacking of Dywane Herbert at 6:00 AM on January 18, 2022. We disagree. First, the government passed the evidence of Mr. Coleman's involvement in this incident — statements by Mr. Akubu made in proffer sessions — to Mr. Coleman approximately three months before trial. *See* DI 595 at 31.

Second, Mr. Coleman was not entitled to pre-trial notice under Rule 404(b) of the government's intent to introduce this evidence because it was intrinsic to the superseding indictment. As we mentioned above, we ruled pre-trial that the government could introduce evidence of the conspirators' uncharged carjackings as intrinsic to the crimes charged. *See* DI 305. And unlike evidence admitted under Rule 404(b), the government does not need to provide notice of its intent to introduce intrinsic evidence. *See United States v. Green*, 617 F.3d 233, 247

(3d Cir. 2010) ("The only consequences of labeling evidence 'intrinsic' are to relieve the prosecution of Rule 404(b)'s notice requirement and the court of its obligation to give an appropriate limiting instruction upon defense counsel's request.") (citation modified).

To this, Mr. Coleman responds that even if this evidence were intrinsic, the government should have disclosed its intent to use it because the government had a pre-trial practice of disclosing all uncharged acts it planned to introduce at trial. *See* DI 226 and DI 330. But the government did not provide notice here because the government *did not* intend to use this evidence at trial. Rather, it was Mr. Coleman who raised his involvement in the January 18th carjacking to the jury.

More specifically, at trial, the complainant Mr. Herbert first testified about the carjacking, but did not identify any of his assailants. *See* DI 496 at 109-124. Then, Agent Yaeger testified about his investigation into the carjacking, but Agent Yaeger did not identify Mr. Coleman as a perpetrator nor did his summary slides identify Mr. Coleman. *Id.* at 156-57, 181. The only reference Agent Yaeger made to Mr. Coleman during his testimony about the January 18th carjacking was that the night before the incident, Mr. McCracken made several phone calls to a contact in his phone listed as "Mooka," who Agent Yaeger said is a person known to be friends with Mr. Coleman. *Id.* at 190-91.

Later in the trial, Agent Yaeger testified about Mr. Coleman's involvement in the four carjackings between January 27 and January 28, 2022. During cross-examination, Mr. Coleman solicited testimony from Agent Yaeger that Mr. Akubu believed Mr. Coleman participated in the January 18th carjacking:

> Coleman's Counsel: Okay. And the second time that you interviewed [Mr. Akubu], this was on -- let me make sure I get this right.

Agent Yaeger: May 11th, 2022

Coleman's Counsel: Yes. You are like an encyclopedia. And that was about four months after the carjackings?

***

Agent Yaeger: Yeah.

Coleman's Counsel: Okay. And this time [Mr. Akubu] mentioned a guy from Dewey Street, correct?

Agent Yaeger: He did, yes.

Coleman's Counsel: Okay. And he said that the only time he remembered him around was in a carjacking -- a completely different carjacking that my client is not charged with, correct?

Agent Yaeger: I don't think that's the -- I don't think he said, the only time I remember him around is with that carjacking. That was the only carjacking that he referenced the Dewey Street person being involved in that particular interview.

Coleman's Counsel: And that was the Ben Franklin Parkway?

Agent Yaeger: That's correct. The January 18th carjacking of Dwayne Herbert.

Coleman's Counsel: And he remembered a lot of details about that carjacking.

Agent Yaeger: He --

Coleman's Counsel: Right. He remembered that it was -- he remembered the car, he remembered that shots were fired, I mean, he remembered the incident?

Agent Yaeger: Yes.

Coleman's Counsel: But -- and he said -- he told you that my client was present for that one?

Agent Yaeger: He did, yes. Well, he said -- again, just to clarify, he said the person he picked up from Dewey Street was there --

Coleman's Counsel: The Dewey Street guy.

> Agent Yaeger: -- who I later determined to be Kavon Coleman, but yes.

DI 518 at 221-22.

Following this exchange, the government established on redirect that its investigation into Mr. Coleman's potential participation in the January 18th carjacking remains open:

> Government Counsel: And can you just generally describe what [Mr. Akubu] said regarding the Dewey Street guy's involvement generally in the conspiracy?
>
> Agent Yaeger: That he participated --
>
> Coleman's Counsel: Objection.
>
> The Court: Overruled.
>
> Agent Yaeger: That he participated in the carjackings this evening of January 27th into January 28th. That he participated in the carjacking of Dywane Herbert and shooting at him by the art museum on the morning of January 18th, 2022. That he may have participated in a carjacking earlier that same evening and the late evening of January 17th, 2022 . . . .
>
> Government Counsel: Okay. And specifically regarding the art museum, the shooting at Dywane Herbert and his carjacking, when you testified to that, you indicated that there was a fourth person involved; is that correct?
>
> Agent Yaeger: For the Dywane Herbert incident?
>
> Government Counsel: Yes.
>
> Agent Yaeger: Yes. Correct. Well, I think [Mr. Herbert] testified that there was a fourth person involved.
>
> Government Counsel: Correct.
>
> Agent Yaeger: And is -- there's still an open investigation into who that fourth person is?
>
> Government Counsel: Yes. Correct. The people charged with that in this trial are Dean Fosque, Mikal McCracken, and Jonathan Akubu has been charged elsewhere. The fourth person has not been charged. But yes, there is an open investigation into who that fourth person is.

> Agent Yaeger: And have you been able to rule out Kavon Coleman as having been a part of the art museum carjacking as well?
>
> Coleman's Counsel: No, I have not.

DI 518 at 262-63. Mr. Coleman's counsel then cross-examined Agent Yaeger again on the issue, establishing that Mr. Coleman has not been formally charged with this carjacking:

> Coleman's Counsel: You've been investigating this conspiracy for several years?
>
> Agent Yaeger: Yes.
>
> Coleman's Counsel: And the carjacking involving Dywane Herbert occurred in 2022?
>
> Agent Yaeger: That's correct.
>
> Coleman's Counsel: And if you any -- if you had evidence to charge my client in that carjacking or any other one, he would've been charged, correct?
>
> Agent Yaeger: If I felt that I had proof beyond a reasonable doubt, I would've pushed the US attorney's office to charge. Yes.

DI 518 at 266-67. Thus, while this cross-examination strategy achieved an important measure of clarification, it came with a tradeoff of opening the door to the government presenting evidence about Mr. Coleman's potential involvement in Dwayne Herbert's carjacking. Therefore, Mr. Coleman cannot now object to this evidence's admissibility. *See United States v. Console*, 13 F.3d 641, 660 (3d Cir. 1993) ("A defendant cannot complain on appeal of alleged errors invited or induced by himself, particularly where, as here, it is not clear that the defendant was prejudiced thereby.") (citation modified); *see also United States v. Kolodesh*, 787 F.3d 224, 231 (3d Cir. 2015) ("[The defendant] thus invited any error and cannot complain now.").

Finally, even if we erred by allowing the jury to hear evidence of Mr. Coleman's potential involvement in the January 18th carjacking (and we did not), Mr. Coleman does not

articulate how this evidence "so infected the jury's deliberations" as to warrant a new trial. *Thornton*, 1 F.3d at 156. As we explain more below in denying Mr. Coleman's Rule 29 motion, the government introduced extensive evidence of Mr. Coleman's charged conduct, and Mr. Coleman does not offer compelling reasons how evidence of his involvement in the January 18th carjacking materially affected the jury's findings of guilt on these charges. Thus, Mr. Coleman's argument for a new trial on this ground is denied.

**b. The 0.40 Caliber Gun**

Next, Mr. Coleman argues that the government made an improper remark in its closing argument by suggesting that he used a .40 caliber gun and shared this gun with Mr. McCracken. We disagree. To start, "the prosecutor is entitled to considerable latitude in summation to argue the evidence and any reasonable inferences that can be drawn from that evidence." *United States v. Green*, 25 F.3d 206, 210 (3d Cir. 1994) (citation modified); *see also United States v. Reilly*, 33 F.3d 1396, 1421 (3d Cir. 1994) (finding that the prosecutor's statements in closing argument were permissible because "there was a basis for the inference" in the record). Thus, "[a] litigant making a prosecutorial misconduct claim based on an allegedly improper summation faces a decidedly uphill journey." *United States v. Ferguson*, 394 F. App'x 873, 887 (3d Cir. 2010).

Here, we think the government introduced more than sufficient evidence that Mr. Coleman used a .40 caliber gun over the course of the conspiracy to argue that in closing. Specifically, investigators recovered three sets of ballistics from the attempted carjacking of Mamady Doumbouya on January 27, 2022: seven FN 5.7x28 Fired Cartridge Casings (FCCs), one .40 caliber FCC, and one 9 mm live round. DI 500 at 70-74. Meanwhile, Mr. Akubu testified that he was the driver for this carjacking, and that Mr. McCracken, Mr. Lee, and Mr.

Coleman jumped out of the car and shot Mr. Doumbouya. DI 521 at 202-203. He also testified that Mr. McCracken used the FN. *Id.* at 203-204. Finally, Mr. Lee testified that he used a "nine" (meaning a 9 mm pistol) while carjacking Mr. Doumbouya. DI 535 at 104. Therefore, by process of elimination — a fair form of inference — Mr. Coleman used the .40 caliber handgun that produced the .40 caliber FCC.

The government also had sufficient evidence to argue that Mr. Coleman shared the .40 gun with Mr. McCracken. In connection with the evening of February 3 — shortly before the conspirators carjacked Agnes Tarpeh — the government introduced GPS data from Mr. Akubu's Camry showing that he stopped at an address on Lindbergh Boulevard (a location tied to Mr. McCracken and Mr. Muse), at Reedland Street (a location tied to Mr. Lee), and at Dewey Street (a location associated with Mr. Coleman.). DI 520 at 30-33. Furthermore, Mr. Akubu testified that he carjacked Ms. Tarpeh with Mr. McCracken, Mr. Muse, and Mr. Lee, and that Mr. McCracken fired a 0.40 caliber gun during the carjacking. DI 522 at 35, 37-39.[10] Investigators later linked the .40 caliber FCC recovered at this scene to the .40 caliber FCC recovered at the carjacking of Mr. Doumbouya. *See* DI 520 at 56-57, 90-97. Thus, from this evidence, the government suggested the logical inference that Mr. McCracken, Mr. Muse, and Mr. Lee stopped at Dewey Street before carjacking Ms. Tarpeh so that Mr. McCracken could borrow Mr. Coleman's gun.

Beyond this evidence, the government also introduced text messages between Mr.

---

[10] Mr. Akubu's testimony was corroborated by video surveillance showing Ms. Tarpeh being carjacked while walking up the steps to her home and one of the offenders firing a gun at Ms. Tarpeh and her husband. DI 520 at 52. Mr. Lee's recollection of the carjacking also matched that of Mr. Akubu. *See* DI 535 at 119-23.

Coleman and Mr. McCracken consistent with them sharing guns. As one example, on February 7, 2022, Mr. Coleman texted Mr. McCracken, "When you come grab me today, can you take me to get the other gat? I can use this one for real, but I want to use the other one."[11] DI 536 at 126-27. All in all, the government was well within bounds to argue in closing that Mr. Coleman used a .40 handgun in the carjackings and shared this gun with Mr. McCracken.

**c. Labeling Mr. Coleman as homeless**

Mr. Coleman next argues that he is entitled to a new trial because the government improperly called Mr. Coleman "homeless" in its closing. Again, we disagree. As the government correctly points out, it was Mr. Coleman's counsel — not the government — who used the word "homeless" in closing arguments:

> Coleman's Counsel: The Dewey Street Guy. From what I remember, we started off as Mr. Coleman being friends with somebody on Dewey Street. Maybe he visited him, but he was friends. By the end of this trial, Mr. Coleman is living at Dewey Street. When did that happen? *When did my client become homeless*?

DI 539 at 58 (emphasis added).

The government said in its closing that, "Coleman doesn't really have a fixed address." DI 538 at 108. But this statement was supported by the record, as the government linked Mr. Coleman to a home on Dewey Street (*see e.g.* DI 518 at 64; DI 521 at 44) as well as homes belonging to Ms. Day (*see e.g*. DI 500 at 151; DI 518 at 175-76) and his mother (*see* DI 536 at 123-24). Therefore, the government was within its rights to argue that Mr. Coleman did not have a fixed address.

**d. The "My Man" text**

[11] Agent Yaeger testified that based on his investigation, the word "gat" meant gun. *See* DI 536 at 119-120.

Next, Mr. Coleman argues that the government made misleading claims about a text message exchange between Mr. Abdul-Hakim and Mr. McCracken that occurred on the morning of January 27, 2022. Specifically, in the exchange, Mr. McCracken refers to "my man" as one of his co-conspirators, and the government inferred in closings that the "my man" must be Mr. Coleman. The full remarks by the government are as follows:

> Government Counsel: Now we also know that at the beginning of this night, you know, at the beginning of the night we've seen, we don't know exactly who's going to go out. We text around, are we going out on a mission tonight? Who's coming out? Fat Leem's always curious, can I come out? Can I come out? At the beginning of the day here, before these even start, we know that Coleman was going to go out this night because McCracken texts Fat Leem in the morning, at like 7:50 in the morning, "We out at like 9:10. Me, you and My Man. He good. All he going to do is drive the JB and you going to hop out." This plan obviously changed because we know Coleman ends up hopping out and Fat Leem doesn't end up going. But this shows us that Coleman was going to go out this night. They knew for at least 7:50 in the morning, probably earlier, that Coleman was going to come out with them because "My Man" is Kavon Coleman.

DI 538 at 112 (referring to Mr. Abdul-Hakim by his established alias, Fat Leem).

We think that the government's argument that Mr. Coleman was "my man," was a reasonable inference to suggest from the record evidence. The government established at trial that Mr. Coleman and Mr. McCracken had a friendly relationship through, among other things, text messages exchanged between the two men as well as Mr. Akubu's testimony that Mr. McCracken brought Mr. Coleman into the conspiracy. *See* DI 536 at 115-132; DI 521 at 44. The government also put forth sufficient evidence — as we explain below in our denial of Mr. Coleman's Rule 29 motion — that Mr. Coleman participated in the carjackings that occurred on January 27. Thus, while not irrefutable, the government had a "basis for the inference" that Mr. McCracken's "man" was Mr. Coleman. *Reilly*, 33 F.3d at 1421.

Additionally, because Mr. Coleman did not object to the government's labeling of Mr.

Coleman as "my man" at trial, we review only for plain error. *See United States v. Kolodesh*, 787 F.3d 224, 230 n.4 (3d Cir. 2015) ("[Defendant] did not lodge a contemporaneous objection to the prosecutor's conduct; rather, he raised the issue for the first time in his motion for a new trial. We therefore review the District Court proceedings for plain error insofar as this argument is concerned."); *see also United States v. Brennan*, 326 F.3d 176, 182 (3d Cir. 2003).

Under the plain error standard, "[i]n order to demonstrate prosecutorial misconduct . . . the review must reveal egregious error or a manifest miscarriage of justice." *United States v. Brown*, 254 F.3d 454, 458 (3d Cir. 2001). Mr. Coleman falls far short of meeting this standard. First, the government presented sufficient evidence independent of the "my man" text to sustain convictions for the carjackings Mr. Coleman committed on January 27, as we explain below in denying his Rule 29 motion. Second, we ameliorated any potential prejudice from the government's remark by instructing the jury that arguments by counsel were not evidence:

> Government Counsel: The evidence from which you are to find the facts consists of the following, the testimony of the witnesses, documents and other things received as exhibits and any fact or testimony that was stipulated that is formerly agreed to by the parties.
>
> The following are not evidence: The superseding indictment, statements and arguments of the lawyers for the parties in this case, questions by the lawyers and questions I may have asked, questions by the lawyers including -- objections by the lawyers, including objections in which lawyers stated facts, any testimony I struck or told you to disregard and anything you may have seen or heard out -- about this case outside the courtroom, of course, is not evidence . . .
>
> . . . Although the lawyers may have called your attention to certain facts or factual conclusions that they thought were important, what the lawyers said is not evidence and is not binding on you. It is your own recollection and interpretation of the evidence that controls your decision in this case . . .

DI 537 at 10-12; *see also Reilly*, 33 F.3d at 1421 ("[T]he district court's instruction to the jury to rely on their recollection of the facts and not counsel's statements and arguments cured any

possible prejudice resulting from the [closing argument] comment."); *United States v. Hamlet*, No. 18-3116, 2025 WL 1577566, at *9 (3d Cir. June 4, 2025) (finding no prosecutorial-misconduct error in the government's closing arguments in part because "the jury was instructed that lawyer's statements like the prosecution's summation are not evidence."). Therefore, for these reasons, we deny Mr. Coleman's motion for a new trial on this ground.

**e. Mr. Coleman's Prison Calls and Emails**

Finally, Mr. Coleman argues that he was prejudiced by what he labels the government's late disclosure of his prison calls and emails that the government used in its direct examination of Ms. Day. And, Mr. Coleman says that the admission of these calls and emails was cumulative and unduly prejudicial, and thus should not have been admitted under Federal Rule of Evidence 403. We reject both of these grounds for a new trial.

Starting with the disclosure issue, the government turned over most of Mr. Coleman's prison calls and emails on August 25, 2025. DI 595 at 49. The government then turned over more recent calls and emails on February 8, 2026, but only introduced one four-line email from its February 8 production during its examination of Ms. Day on February 24, 2026. *Id.* at 50. All other calls and emails that the government admitted into evidence came from its earlier production. *Id.*

Mr. Coleman counters that the August 2025 and February 2026 productions contained thousands of emails, and thus it was unrealistic for him to review these documents before trial. But Mr. Coleman does not cite any authority for his proposition that the government was obligated to narrow this universe of documents before trial, and if Mr. Coleman needed more

resources to review these emails and calls, he should have asked.[12] Furthermore, when Mr. Coleman reached out to the government on February 8, 2026 to identify the specific evidence it intended to introduce during the testimony of Ms. Day, the government complied with his request. DI 595 at 50. True, the government provided this information the night before Ms. Day's testimony. But the calls and emails the government introduced were not extensive,[13] and from our vantage point, Mr. Coleman's counsel ably cross-examined both Ms. Day and Agent Yaeger about this evidence at trial. See DI 500 at 183-190; DI 518 at 199-232. To this day, Mr. Coleman has not explained what new information he would have raised to the jury if he had more time to digest this evidence. Thus, Mr. Coleman has not demonstrated prejudice from the government's disclosure process for his prison calls and emails.

As for Mr. Coleman's contention that his prison calls and emails should have been excluded under Rule 403, we disagree. Rule 403 allows us to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." The Rule "creates a presumption of admissibility" and thus we should "utilize the rule only rarely to cause the exclusion of evidence." *United States v. Universal Rehab. Servs. (PA), Inc.*, 205 F.3d 657, 664 (3d Cir. 2000); *see also United States v.*

---

[12] We also note that the government placed Mr. Coleman on notice of the types of calls and emails it intended to present at trial in its December 11, 2025 "Motion in Limine to Admit Audio Recordings." *See* DI 328. Specifically in the motion, the government stated that it "may seek to introduce portions of recorded calls between the defendants and others made by the defendants while in custody" including a March 10, 2024 call from Mr. Coleman to Ms. Day where "Coleman chastised [Ms. Day] for speaking to the agents." *Id.* at 7.

[13] In total, the government identified 3 phone calls and 34 emails that it intended to introduce during Ms. Day's testimony. *See* DI 579 at 31.

*Bergrin*, 682 F.3d 261, 279 (3d Cir. 2012) ("It must always be remembered that *unfair* prejudice is what Rule 403 is meant to guard against, that is, prejudice based on something other than the evidence's persuasive weight.") (citation modified).

Here, Mr. Coleman's prison calls and emails shed light on Mr. Coleman's attempts to prevent Ms. Day from speaking with the government and his frustrations with her for cooperating. *See* DI 500 at 165-182. Such evidence is highly probative because it demonstrates consciousness of guilt. *See United States v. Lingala*, 91 F.4th 685, 696 (3d Cir. 2024) (finding that defendant's letters threatening his girlfriend to prevent her testimony was "highly probative" as it "suggested [defendant's] consciousness of guilt"); *United States v. Elwell*, 515 F. App'x 155, 162 (3d Cir. 2013) ("Such witness tampering could in turn support an inference that [defendant] was conscious of his guilt."). On the flip side, while we take Mr. Coleman's point that some of the later e-mails were a bit cumulative of the earlier documents, Mr. Coleman did not articulate at trial nor in his post-trial motion how this cumulativeness *substantially outweighed* the evidence's probative value. Therefore, for these reasons, Mr. Coleman's prison calls and emails were properly admitted into evidence.

### D. Mr. Coleman has not shown that he is entitled to a judgement of acquittal under Rule 29

Mr. Coleman next argues that he is entitled to a judgment of acquittal as to counts one and 39-41 of the superseding indictment. We disagree.

#### a. Count One

Count one of the superseding indictment charged Mr. Coleman with a violation of 18 U.S.C. § 371: Conspiracy to commit offense or to defraud United States. Specifically, count one reads:

> From in or about October 2021 to in or about October 2022, in Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendants . . . conspired and agreed . . . to commit an offense against the United States, that is, to knowingly and unlawfully take or attempt to take with intent to cause death and serious bodily harm and through force and violence, and by intimidation, motor vehicles that had been transported, shipped, and received in interstate and foreign commerce, in violation of Title 18, United States Code, Section 2ll9; to transport stolen motor vehicles in interstate commerce, knowing them to have been stolen, in violation of Title 18 United States Code, Section 2312; and to export stolen motor vehicles knowing them to have been stolen, in violation of Title 18 United States Code, Section 553(a)(1).

DI 68 at 2. To prevail on the § 371 charge, the government had to prove the following elements beyond a reasonable doubt: "(1) an agreement between two or more persons to achieve an unlawful goal; (2) the defendant intentionally joined the agreement, with knowledge of its objective; and (3) an overt act taken in furtherance of the conspiracy by a co-conspirator." *United States v. Whiteford*, 676 F.3d 348, 357 (3d Cir. 2012).

Here, the government presented more than enough evidence to sustain Mr. Coleman's conviction under § 371: First, Mr. Akubu identified Mr. Coleman as a member of the conspiracy and testified that he committed four carjackings with him as well as Mr. McCracken and Mr. Lee over a roughly ten-hour period between January 27-28, 2022. *See* DI 521 at 43-44, 202-214. Mr. Akubu's testimony was reinforced by cell-site data and text messages that placed Mr. McCracken, Mr. Akubu, and Mr. Lee at the relevant carjackings over this 10-hour period. *See* DI 518 at 44-269. Mr. Coleman was not using his phone during these carjackings, but Ms. Day testified that she received texts and calls from Mr. McCracken's phone and Mr. Lee's phone during and immediately after the crime spree that she attributed to Mr. Coleman, raising the logical inference that Mr. Coleman was with his co-defendants and borrowed their phones. DI 500 at 153-160; DI 518 at 127-179.

The government also introduced evidence that Mr. Akubu paid Mr. Coleman for his assistance with the January 27-28th carjackings. Specifically, on January 29, 2022, Mr. McCracken again messaged Ms. Day advising her to tell "Ski" (Coleman's nickname as established through his own admissions and his Instagram name) that "bro" went to "NC" to get the "bread." DI 518 at 188. The conspirators used "bread" synonymous with money, DI 518 at 194, and Agent Yaeger introduced evidence showing that Mr. Akubu went to North Carolina on January 29 and returned to Philadelphia in the evening. *Id.* at 190. Then in the early morning hours of January 30, Mr. Coleman posted a photo of a stack of cash and a gun on his Instagram with the caption, "what makes my world go round." *Id.* at 194-95.

Finally, the government introduced apparently deleted messages between Mr. McCracken and Mr. Coleman from February 2022 that added more context to Mr. Coleman's involvement in the overall conspiracy. The two men discuss what appear to be specific carjackings[14] and reference the "bitch with the Range," who the government established was one of the carjacking victims. *See* DI 536 at 114-132.

Mr. Coleman tries to minimize this evidence by arguing that his charged conduct only lasted several hours. But the government was not required to establish that Mr. Coleman was a member of the conspiracy for a minimum time to sustain a conviction under § 371. *See United States v. Graham*, 639 F. App'x 152, 154 (3d Cir. 2016) ("[A]s long as [the defendant] agreed with the others to try to accomplish the object of the conspiracy . . . it is entirely irrelevant that the conspiracy was well underway by the time [the defendant] joined it."). Mr. Coleman also

---

[14] For example, Mr. Coleman texted Mr. McCracken at 7:01pm on February 2, 2022 "'The two Johns we grabbed gone?' which the government argued was in reference to the carjackings the two men carried out between January 27-28, 2022. DI 536 at 118-119.

argues that the government did not put forward evidence that Mr. Coleman knew the carjacked vehicles were being transported across state lines and eventually to Africa. However, "it is well-established that one conspirator need not . . . be aware of all the details of the conspiracy in order to be found to have agreed to participate in it." *United States v. Fattah*, 914 F.3d 112, 166 n.19 (3d Cir. 2019) (citation modified); *see also United States v. Padilla*, 982 F.2d 110, 114 (3d Cir. 1992) ("The government need not prove that each defendant knew all the details, goals, or other participants [in the conspiracy]."). All in all, the government introduced more than sufficient evidence for a reasonable jury to find: (1) the existence of an agreement to carjack vehicles; (2) that Mr. Coleman joined this agreement with knowledge and intent of its objectives, and (3) that the conspirators (including Mr. Coleman) took overt acts in furtherance of the agreement. Thus, we deny Mr. Coleman's motion for a judgment of acquittal on his § 371 charge.

**b. Counts 39-41**

Count 39 of the superseding indictment charged Mr. Coleman with attempted carjacking under 18 USC § 2119 for the attempted carjacking of Mamady Doumbouya on January 27, 2022 at 8:00 PM. Counts 40 and 41 of the superseding indictment charged Mr. Coleman with carjacking under 18 USC § 2119 and using and carrying of a firearm in relation to this crime under 18 U.S.C. § 924(c)(1)(A) for the carjacking of Felix Colomb on January 27, 2022 at 8:55 PM.

To convict for carjacking under 18 U.S.C. § 2119, the government had to prove that Mr. Coleman: "(1) with intent to cause death or serious bodily harm (2) took a motor vehicle (3) that had been transported, shipped or received in interstate or foreign commerce (4) from the person or presence of another (5) by force and violence or intimidation." *United States v. Augustin*, 376

F.3d 135, 139-140 (3d Cir. 2004). And to sustain a conviction for attempted carjacking, the government had to show that Mr. Coleman: "(1) acted with the requisite intent to violate [18 U.S.C. § 2119], and (2) performed an act that, under the circumstances as he believes them to be, constitutes a substantial step in the commission of the crime." *United States v. Tykarsky*, 446 F.3d 458, 469 (3d Cir. 2006) (citation modified).

Here, the government presented sufficient evidence for the jury to convict Mr. Coleman for both the attempted and completed carjackings, and the accompanying firearm charge under § 924(c). First, both Mr. Doumbouya and Mr. Colomb testified to being carjacked at the relevant times by three assailants.[15] Specifically, Mr. Doumbouya testified that the assailants approached him after he parked his car, prompting him to run away. The assailants then shot him in the right leg. DI 492 at 241-252. Mr. Colomb meanwhile testified that the assailants forced him out of his parked car at gunpoint and then drove his car away. DI 500 at 94-108. Second, Mr. Akubu testified that Mr. Coleman participated in both the attempted carjacking of Mr. Doumbouya and the completed carjacking of Mr. Colomb and that Mr. Coleman was armed for both crimes. *See* DI 521 at 202-210. Third, GPS data showed that Mr. Akubu's car stopped at an address on Dewey Street associated with Mr. Coleman[16] at 6:38 PM, just under an hour before the first

[15] Mr. Coleman argues that the victims' recollection of only three assailants contradicts Mr. Akubu's testimony that he committed these crimes along with Mr. McCracken, Mr. Lee and Mr. Coleman. But Mr. Akubu testified to staying in his car for these crimes, so it makes sense that the victims only witnessed three carjackers. *See* DI 521 at 202-210.

[16] To prove Mr. Coleman's association with the Dewey Street address, the government introduced evidence that Mr. Coleman listed the Dewey Street address in his Cash App account and the government also introduced a call between Mr. Coleman and another person of interest — Jerwayne Haywood — where the two men discussed the address. *See* DI 518 at 64, 69-81. For note, the government established that Mr. Haywood was on probation in January

carjacking of the evening, and that Mr. Akubu's car later traveled to the scenes of both the Doumbouya and Colomb carjackings. *See* DI 518 at 94-118. Finally, for the interstate commerce nexus needed to sustain a conviction under § 2119, the government introduced evidence that Mr. Doumbouya's car was manufactured in Indiana and Mr. Colomb's car was manufactured in the United Kingdom. *See* DI 518 at 102, 112. Viewing this evidence in the light most favorable to the prosecution, a reasonable jury could sustain a conviction on all three counts.

## V. CONCLUSION

For the reasons explained above, Mr. McCracken, Mr. Muse, Mr. Abdul-Hakim, Mr. Fosque, and Mr. Coleman's motions for a new trial and Mr. Coleman's motion for a judgment of acquittal as to counts one and 39-41 are denied. An appropriate order follows this memorandum.

2022, and as part of this probation he had to wear an ankle monitor, which showed that he never left his home on January 27. *See* DI 500 at 195-204.